**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

MI FAMILIA VOTA EDUCATION
   FUND, *et al.*,

               Plaintiffs,

               v.

DONALD J. TRUMP, in his individual
   capacity and official capacity as President
   of the United States, *et al.*,

               Defendants.

Civil Action No. 20-cv-03030 (RJL)

**OFFICIAL-CAPACITY DEFENDANTS' OPPOSITION TO PLAINTIFFS'
MOTION FOR A TEMPORARY RESTRAINING ORDER, PRELIMINARY
INJUNCTION, AND SPEEDY DECLARATORY JUDGMENT**

Dated: October 26, 2020

JEFFREY BOSSERT CLARK
Acting Assistant Attorney General

JOHN V. COGHLAN
Deputy Assistant Attorney General

ALEXANDER K. HAAS
Director

JAMES J. GILLIGAN
Special Litigation Counsel

JOSHUA E. GARDNER
Special Counsel

STEPHEN M. ELLIOTT
Senior Counsel

U.S. Department of Justice
Civil Division, Federal Programs Branch
1100 L Street, NW
Washington, DC  20005
Tel:  (202) 305-7583
Fax:  (202) 616-8470
E-mail:  Joshua.E.Gardner@usdoj.gov

*Counsel for Defendants*

## TABLE OF CONTENTS

INTRODUCTION AND BACKGROUND ..........................................................................................1

LEGAL STANDARDS..............................................................................................................5

ARGUMENT............................................................................................................................7

    I.      PLAINTIFFS ARE NOT LIKELY TO SUCCEED ON THE MERITS OF
          THEIR CLAIM. ..........................................................................................................7

        A.  The Court Lacks Subject-Matter Jurisdiction Over Plaintiffs' VRA Claim. ..................7

            1.  Plaintiffs' VRA Claim Against the Official-Capacity Defendants Is Barred
                by Sovereign Immunity, Because Section 11(b) Contains No Express
                Private Right of Action Against Officers of the United States. ...............................7

            2.  Plaintiffs Lack Standing. ...................................................................................11

                a.   Plaintiffs Schwartz and Lopez.....................................................................12

                b.   Mi Familia Vota .........................................................................................17

                c.   Certain of Plaintiffs' Asserted Injuries Are Not Traceable To
                    Defendants' Conduct...................................................................................22

        B.  Plaintiffs Have Failed to Establish That Any of Defendants' Alleged Conduct
            Violates Section 11(b) of the VRA..................................................................................25

    II.     PLAINTIFFS CANNOT DEMONSTRATE IRREPARABLE HARM 29

    III.    THE BALANCE OF THE EQUITIES DOES NOT JUSTIFY RELIEF 30

    IV.    THE INJUNCTIVE RELIEF PLAINTIFFS SEEK IS IMPROPER 32

        A.  Plaintiffs Cannot Obtain Equitable Relief Against the President in his
            Official Capacity ............................................................................................................32

        B.  Plaintiffs' Proposed Injunction Fails to Comply with Federal Rule of Civil
            Procedure 65 .................................................................................................................38

    V.     PLAINTIFFS' REQUEST FOR A SPEEDY HEARING UNDER RULE 57
          SHOULD BE DENIED .................................................................................................41

CONCLUSION.......................................................................................................................43

# TABLE OF AUTHORITIES

**CASES**

*Aamer v. Obama,*
   742 F.3d 1023 (D.C. Cir. 2014) ............................................................................. 6, 7

*Abigail All. for Better Access to Dev. Drugs v. Eschenbach,*
   469 F.3d 129 (D.C. Cir. 2006) ...............................................................................18

*Al-Aulaqi v. Obama,*
   727 F. Supp. 2d 1 (D.D.C. 2010) ...................................................................... 21, 22

*Allen v. St. Bd. of Elections,*
   393 U.S. 544 (1969) ............................................................................................. 8, 9

*Am. Soc'y for Prevention of Cruelty to Animals v. Feld Entm't, Inc.,*
   659 F.3d 13 (D.C. Cir. 2011) ...................................................................... 17, 18, 20

*American Immigration Lawyers Ass'n v. Reno,*
   199 F.3d 1352 (D.C. Cir. 2000) ...............................................................................22

*Anderson v. Obama,*
   No. CIV. PJM 10-17, 2010 WL 3000765 (D. Md. July 28, 2010) ...........................34

*Ariz. Dem. Pty. v. Ariz. Repub. Pty.,* No. CV-16-3752,
   2016 WL 8669978 (D. Ariz. Nov. 4, 2016) ....................................................... 26, 27

*Atiyeh v. Capps,*
   101 S. Ct. 829 (1981) ...............................................................................................38

*Barnes v. Small,*
   840 F.2d 972 (D.C. Cir. 1987) .................................................................................31

*Beatty v. Washington Metro. Area Transit Auth.,*
   860 F.2d 1117 (D.C. Cir. 1988) ...............................................................................35

*Bernstein v. Kerry,*
   962 F. Supp. 2d 122 (D.D.C. 2013) .........................................................................16

*Carlson v. Bush,*
   No. 6:07CV1129-ORL19UAM, 2007 WL 3047138 (M.D. Fla. Oct. 18, 2007) ...............34

*Chamber of Commerce v. Reich,*
   74 F.3d 1322 (D.C. Cir. 1996) .................................................................................36

*Chaplaincy of Full Gospel Churches v. England,*
   454 F.3d 290 (D.C. Cir. 2006) .......................................................................... 29, 30

*Citizens United v. FEC,*
    558 U.S. 310 (2010) ..................................................................... 27, 31

*CityFed Fin. Corp. v. Office of Thrift Supervision,*
    58 F.3d 738 (D.C. Cir. 1995) ............................................................ 6, 29

*Clapper v. Amnesty Int'l USA,*
    568 U.S. 398 (2013) ....................................................................... *passim*

*Clinton v. Jones,*
    520 U.S. 681 (1997) ............................................................................ 36

*Cobell v. Norton,*
    391 F.3d 251 (D.C. Cir. 2004) ............................................................. 6

*Comm. on the Judiciary of the U.S. House of Representatives v. Miers,*
    542 F.3d 909 (D.C. Cir. 2008) ........................................................... 37

*Comm. to Establish the Gold Standard v. United States,*
    392 F. Supp. 504 (S.D.N.Y. 1975) ..................................................... 34

*Common Cause v. Nuclear Regulatory Comm'n,*
    674 F.2d 921 (D.C. Cir. 1982) ........................................................... 39

*Commonwealth of Pennsylvania v. DeJoy,*
    No. 20-4096, 2020 WL 5763553 (E.D. Pa. Sept. 28, 2020) ............... 14

*County of Butler v. Wolf,*
    No. 2:20-cv-677, 2020 WL 2769105 (W.D. Pa, May 28, 2020) ............ 7

*Cty. of Santa Clara v. Trump,*
    250 F. Supp. 3d 497 (N.D. Cal. 2017),
    *appeal docketed* No. 17-16886 (9th Cir. Sept. 18, 2017) ................... 34

*DaimlerChrysler Corp. v. Cuno,*
    547 U.S. 332 (2006) ............................................................................ 11

*Davidson v. Loudon Cty. Bd. of Supervisors,*
    267 F. Supp. 3d 702 (E.D. Va. 2017) ................................................ 31

*Davis v. Pension Ben. Guar. Corp.,*
    571 F.3d 1288 (D.C. Cir. 2009) ......................................................... 30

*Day v. Obama,*
    No. 1:15-cv-00671, 2015 WL 2122289 (D.D.C. May 1, 2015) ........... 34

*Dem. Nat'l Comm. v. Bostelmann,*
    No. 20-cv-249, 2020 WL 5627186 (W.D. Wisc. Sept. 21, 2020) ........ 28

*Dem. Nat'l Comm. v. Repub. Nat'l Comm.*,
  No. 81-3876, 2016 WL 6584915 (D.N.J. Nov. 5, 2016) .......................................................26

*Dorsey v. Barber*,
  No. 5:04-cv-2151, 2005 WL 2211176 (N.D. Ohio Sept. 9, 2005),
  *rev'd in part on other grounds*, 517 F.3d 389 (6th Cir. 2008) ...........................................9

*Dwares v. City of New York*,
  985 F.2d 94 (2d Cir. 1993),
  *overruled on other grounds by Leatherman v. Tarant County Narcotics Intelligence & Coordination Unit*, 507
  U.S. 163 (1993) ................................................................................................................24

*Equal Rights Ctr. v. Post Properties, Inc.*,
  633 F.3d 1136 (D.C. Cir. 2011) ..............................................................................17, 18, 19

*FAA v. Cooper*,
  566 U.S. 284 (2012) ...............................................................................................8, 9, 10

*FDIC v. Meyer*,
  510 U.S. 471 (1994) .............................................................................................................10

*Feiner v. New York*,
  340 U.S. 315 (1951) .............................................................................................................32

*Food & Water Watch, Inc. v. Vilsack*,
  808 F.3d 905 (D.C. Cir. 2015) ..........................................................................16, 18, 19, 20

*Franklin v. Massachusetts*,
  505 U.S. 788 (1992) ...........................................................................................33, 35, 36, 37

*Freedom Republicans, Inc. v. Federal Election Com'n*,
  13 F.3d 412 (D.C. Cir. 1994) ..............................................................................................23

*Gardner v. Newsom*,
  No. 1:20-cv-00240, 2020 WL 4808686 (E.D. Cal. Jul. 10, 2020) ...................................7, 41

*GEC US 1 LLC v. Frontier Renewables, LLC*,
  No. 16-cv-1276, 2016 WL 3345456 (N.D. Cal. Jun. 16, 2016)........................................7, 42

*GEO Specialty Chemicals, Inc. v. Husisian*,
  923 F. Supp. 2d 143 (D.D.C. 2013) ....................................................................................30

*Greater New Orleans Fair Hous. Action Ctr. v. HUD*,
  639 F.3d 1078 (D.C. Cir. 2011) .......................................................................................6, 25

*Harlow v. Fitzgerald*,
  457 U.S. 800 (1982) .............................................................................................................36

*Havens Realty Corp. v. Coleman,*
    455 U.S. 363 (1982) ...................................................................................................17

*Hawaii v. Trump,*
    859 F.3d 741 (9th Cir.),
    *vacated and remanded on other grounds*, 138 S. Ct. 377, 199 L. Ed. 2d 275 (2017) ....................................34

*Heckler v. Chaney,*
    470 U.S. 821 (1985) ...................................................................................................10

*Hunter v. FERC,*
    527 F. Supp. 2d 9 (D.D.C. 2007) .............................................................................31

*In re Navy Chaplaincy,*
    738 F.3d 425 (D.C. Cir. 2013) ....................................................................................6

*Int'l Academy of Oral Medicine & Toxicology v. FDA,*
    195 F. Supp. 3d 243 (D.D.C. 2016) ..........................................................................20

*Int'l Refugee Assistance Project v. Trump,*
    265 F. Supp. 3d 570 (D. Md. 2017) ..........................................................................34

*Int'l Refugee Assistance Project v. Trump,*
    857 F.3d 554 (4th Cir. 2017) .....................................................................................34

*Int'l Refugee Assistance Project v. Trump,*
    857 F.3d 557 (4th Cir. 2017) .....................................................................................34

*Jack's Canoes & Kayaks, LLC v. Nat'l Park Serv.,*
    933 F. Supp. 2d 58 (D.D.C. 2013) ........................................................................5, 6

*Johnson v. Mississippi,*
    488 F.2d 284 (5th Cir. 1974) .....................................................................................27

*Jones v. USPS,*
    No. 20-CIV-6516, 2020 WL 5627002 (S.D.N.Y. Sept. 21, 2020) .........................14

*Kentucky v. Graham,*
    473 U.S. 159 (1985) .....................................................................................................8

*Kowalski v. Tesmer,*
    543 U.S. 125 (2004) .......................................................................................12, 21, 22

*Laird v. Tatum,*
    408 U.S. 1 (1972) .......................................................................................................16

*Lane v. Pena,*
    518 U.S. 187 (1996) ............................................................................................8, 9, 10

*Lovitky v. Trump,*
No. 19-1454, 2019 WL 3068344 (D.D.C. July 12, 2019),
*aff'd in part, vacated in part on other grounds*, 949 F.3d 753 (D.C. Cir. 2020) .............................................35

*Lujan v. Defenders of Wildlife,*
504 U.S. 555 (1992) ............................................................................................................... 17, 23

*LULAC Richmond Reg'l Council 4614 v. Pub. Interest Legal Found.*,
No. 1:18-cv-423, 2018 WL 3848404 (E.D. Va. Aug. 13, 2018).......................................... 9, 26

*McMeans v. Obama,*
No. 11-cv- 891, 2011 WL 6046634 (D. Del. Dec. 1, 2011) ....................................................34

*Morse v. Republican Party of Va.*,
517 U.S. 186 (1996) ..................................................................................................................9

*Munaf v. Geren,*
553 U.S. 674 (2008) ................................................................................................................25

*Mississippi v. Johnson,*
71 U.S. 475 (1866) ................................................................................................. 32, 33, 35, 36

*Nat'l Ass'n of Home Builders v. EPA,*
667 F.3d 6 (D.C. Cir. 2011).....................................................................................................19

*Nat'l Ass'n of Internal Revenue Emps. v. Nixon,*
349 F. Supp. 18 (D.D.C. 1972)................................................................................................34

*New York v. Trump,*
No. 20-cv-2340, 2020 WL 5763775 (D.D.C. Sept. 27, 2020) ................................................14

*Newdow v. Bush,*
355 F. Supp. 2d 265 (D.D.C. 2005) ...............................................................................35, 36, 37

*Newdow v. Roberts,*
603 F.3d 1002 (D.C. Cir. 2010) ..........................................................................................36, 37

*Nixon v. Fitzgerald,*
[457 U.S. 731 (1982) ...........................................................................................................33, 37

*Nken v. Holder,*
556 U.S. 418 (2009) ..................................................................................................................6

*Nordstrom, Inc. v. PARAN*,
No. 92-1349, 1992 WL 172573 (D.D.C. Jun. 29, 1992) .........................................................31

*NTEU v. U.S.*,
101 F.3d 1423 (D.C. Cir. 1996) ..............................................................................................19

*Ohio Dem. Pty. v. Ohio Repub. Pty.,*
No. 16-4268, 2016 WL 6608962 (6th Cir. Nov. 6, 2016),
137 S. Ct. 15 (Nov. 7, 2016) .......................................................................... 26, 27

*Parson v. Alcorn,*
157 F. Supp. 3d 479 (E.D. Va. 2016) ............................................................ 26, 28

*Penn. Dem. Pty. v. Repub. Pty. of Penn.,*
No. 16-5664, 2016 WL 6582659 (E.D. Pa. Nov. 7, 2016) ............................ 26, 27

*People for the Ethical Treatment of Animals v. USDA,*
797 F.3d 1087 (D.C. Cir. 2015) ................................................................17, 18, 19

*Perry v. Correct Care Solutions, LLC,*
No. 1:17-cv-586, 2017 WL 11519168 (E.D. Va. Jun. 2, 2017) ....................... 7, 41

*Pincham v. Ill. Judicial Inquiry Bd.,*
681 F. Supp. 1309 (N.D. Ill. 1988),
*aff'd,* 872 F.2d 1341 (7th Cir. 1989) ...................................................................9

*Powers v. Ohio,*
499 U.S. 400, (1991) ..................................................................................... 21, 22

*Reese v. Nixon,*
347 F. Supp. 314 (C.D. Cal. 1972) ....................................................................34

*Return Mail, Inc. v. USPS,*
139 S. Ct. 1853 (2019) ......................................................................................10

*Richardson v. Trump,*
No. 20-2262, 2020 WL 5969270 (D.D.C. Oct. 8, 2020) ....................................14

*S. Carolina v. Katzenbach,*
383 U.S. 301 (1966) ..........................................................................................10

*S.F. Redevelopment Agency v. Nixon,*
329 F. Supp. 672 (N.D. Cal. 1971) .....................................................................34

*Samuels v. Mackell,*
401 U.S. 66 (1971) ............................................................................................37

*Sanchez-Espinoza v. Regan,*
770 F.2d 202 (D.C. Cir. 1985) ...........................................................................37

*Schmidt v. Lessard,*
414 U.S. 473 (1974) ..........................................................................................38

*Settle v. Obama,*
  No. 3:15-cv-365, 2015 WL 7283105 (E.D. Tenn. Nov. 17, 2015) .......................................34

*Shelby Cnty. v. Holder,*
  43 F. Supp. 3d 47 (D.D.C. 2014),
  *aff'd,* 799 F.3d 1173 (D.C. Cir. 2015) ..................................................................................10

*Sherley v. Sebelius,*
  644 F.3d 388 (D.C. Cir. 2011) ...............................................................................................6

*Shreeve v. Obama,*
  No. 1:10-cv-71, 2010 WL 4628177 (E.D. Tenn. Nov. 4, 2010) .........................................34

*Sierra Club v. Wheeler,*
  956 F.3d 612 (D.C. Cir. 2020) ........................................................................................... 7, 8

*Simon v. E. Ky. Welfare Rights Org.,*
  426 U.S. 26 (1976) ................................................................................................................23

*Singh v. Carter,*
  185 F. Supp. 3d 11 (D.D.C. 2016) .........................................................................................6

*Spokeo, Inc. v. Robins,*
  136 S. Ct. 1540 (2016) ................................................................................................... 11, 17

*Steel Co. v. Citizens for a Better Env't,*
  523 U.S. 83 (1998) ................................................................................................................11

*Vermont Agency of Nat. Resources v. U.S. ex rel. Stevens,*
  529 U.S. 765 (2000) ..............................................................................................................10

*Suskin v. Nixon,*
  304 F. Supp. 71 (N.D. Ill. 1969) ..........................................................................................34

*Sw. Power Admin. v. FERC,*
  763 F.3d 27 (D.C. Cir. 2014) ............................................................................................ 9, 10

*Swann v. Clinton.,*
  100 F.3d 973 (D.C. Cir. 1996) ......................................................................................*passim*

*Town of Chester, N.Y. v. Laroe Estates, Inc.,*
  137 S. Ct. 1645 (2017) ..........................................................................................................11

*Trump v. Int'l Refugee Assistance,*
  138 S. Ct. 353 (2017) ............................................................................................................34

*United States v. Bormes,*
  568 U.S. 6 (2012) ..................................................................................................................10

*United States v. McLeod,*
   385 F.2d 738 (5th Cir. 1967)..................................................................................27

*United States v. Patane,*
   542 U.S. 630 (2004).............................................................................................31

*United States v. Phillip Morris USA Inc.,*
   566 F.3d 1095 (D.C. Cir. 2009) ..........................................................................39

*United States v. Sherwood,*
   312 U.S. 584 (1941)...............................................................................................7

*Valley Forge Christian Coll. v. Americans United for Separation of Church & State, Inc.,*
   454 U.S. 464 (1982).............................................................................................12

*Vote Forward v. DeJoy,*
   No. 20-2405, 2020 WL 5763869 (D.D.C. Sept. 28, 2020) ................................14

*Waite v. Macy,*
   246 U.S. 606 (1918).............................................................................................31

*Warth v. Seldin,*
   422 U.S. 490 (1975)................................................................................11, 12, 23

*Washington v. Trump,*
   No. 1:20-CV-03127-SAB, 2020 WL 5568557 (E.D. Wash. Sept. 17, 2020)......14

*Watts v. United States,*
   394 U.S. 705 (1969).............................................................................................27

*Willis v. Dep't of Health & Human Servs.,*
   38 F. Supp. 3d 1274 (W.D. Okla. 2014)...............................................................34

*Wilton v. Seven Falls Co.,*
   515 U.S. 277 (1995)...............................................................................................6

*Winter v. Nat. Res. Def. Council, Inc.,*
   555 U.S. 7 (2008)............................................................................................6, 29

*Ziglar v. Abbasi,*
   137 S. Ct. 1843 (2017)...........................................................................................9

**STATUTES**

5 U.S.C. § 702...........................................................................................................10

18 U.S.C. § 592...................................................................................................29, 40

18 U.S.C. § 594 ...................................................................................................................27

42 U.S.C. § 1983 .................................................................................................................24

42 U.S.C. § 1985 ...................................................................................................................2

52 U.S.C. § 10307 ........................................................................................................*passim*

52 U.S.C. § 10308 ..........................................................................................................8, 10

52 U.S.C. § 10310 ........................................................................................................10, 28

**RULES**

Fed. R. Civ. P. 12 ...........................................................................................................41, 42

Fed. R. Civ. P. 57 .......................................................................................................*passim*

Fed. R. Civ. P. 65 .......................................................................................................*passim*

**UNITED STATES CONSTITUTION**

U.S. Const., Art. II, § 3 ....................................................................................................33

**OTHER AUTHORITIES**

25 Pa. Cons. Stat § 3527 .................................................................................................27

25 Pa. Cons. Stat. § 2687 ................................................................................................27

Att'y Gen. William P. Barr, *Statement on Riots and Domestic Terrorism* (May 31, 2020)
    https://www.justice.gov/opa/pr/attorney-general-william-p-barrs-statement-riots-and-domestic-
    terrorism ...................................................................................................................28

Civil Rights Div. Assistant Att'y Gen. Thomas E. Perez, *Statement Before the U.S. Comm'n on Civil
    Rights* (May 14, 2010), https://www.usccr.gov/pubs/NBPH/docs/Perez_05-14-2010.pdf ..........26

U.S. Dep't of Justice, *Federal Prosecution. of Election Offenses* 73 (8th ed. 2017),
    https://www.justice.gov/criminal/file/1029066/download...............................................29

**INTRODUCTION AND BACKGROUND**

Less than two weeks before the presidential election, Plaintiffs—two individuals and a non-profit civic organization—raise a kitchen sink of disparate allegations against the President, the Attorney General, and the Acting Secretary of Homeland Security, contending that Defendants have violated, among other laws, Section 11(b) of the Voting Rights Act of 1965, 52 U.S.C. § 10307(b) (VRA).  On the basis of these allegations, they maintain that this Court must intervene in the pending election, regulate the deployment of law enforcement personnel charged with protecting public safety, and—most astonishingly—impose a prior restraint on the President's speech in the campaign's waning days.  Although many of Plaintiffs' allegations are months old, and their claims of injury conjectural, Plaintiffs nevertheless contend that they need emergency relief in the form of a temporary restraining order, a preliminary injunction, and a "speedy declaratory judgment" under Federal Rule of Civil Procedure 57.  Yet Plaintiffs' motion reads more like a political tract reflecting their policy disagreements with the President rather than a credible legal argument concerning voting rights.  As discussed below, Plaintiffs cannot establish any of the requirements for emergency injunctive relief, or expedited declaratory relief, and their motion should be denied.

Plaintiffs are two registered voters, Sara Schwartz and Marla Lopez, who reside in Philadelphia, Pennsylvania and Houston, Texas, respectively, and Mi Familia Vota Education Fund (MFV), a "civic engagement organization" whose mission includes "voter registration, and voter engagement."  Compl. for Decl. & Inj. Relief ¶¶ 8-10 (ECF No. 1).  They allege that Defendants—President Donald J. Trump, in his individual and official capacities, Attorney General William P. Barr, and Acting Secretary of Homeland Security Chad F. Wolf, in their official capacities[1]—have, through alleged actions taken and statements made over the past five months, "encouraged activist

---

[1] This filing is submitted on behalf of the President, in his official capacity only, the Attorney General, and the Acting Secretary (collectively, the "official-capacity Defendants").  The President is represented in his personal capacity in this matter by separate counsel.

Trump supporters and [violent] white supremacist groups . . . to go to polling locations to serve as 'poll watchers'; . . . publicly discredited voting by mail; sabotaged mail delivery [to make] voting by mail less reliable; [and] threatened to ban voting by mail or prevent mailed-in votes from being counted." *Id.* ¶ 2.  Plaintiffs contend that Defendants' alleged conduct "has the purpose and effect of intimidating Americans from voting," in violation of Section 11(b) of the VRA, 52 U.S.C. § 10307(b), Section 2 of the Ku Klux Klan Act of 1871, 42 U.S.C. § 1985(3), and the First, Fifth, and Fourteenth Amendments.  *Id.* ¶¶ 4, 196-205.  Plaintiffs assert that because of Defendants' alleged conduct, Mss. Schwartz and Lopez are "afraid," "concerned," and "worried" that they would be threatened and intimidated at the polls by law enforcement agents, "white supremacists," and "vigilantes" if they attempted to vote (or drop off their ballots) in person, and that their ballots, if mailed, may be delayed, go uncounted, or subject them to "scrutiny" and "investigation."  *See generally* Decl. of Sara Schwartz (Schwartz Decl.) (ECF No. 2-3); Decl. of Marla Lopez (Lopez Decl.) (ECF No. 2-4).  MFV claims that it "has had to devote substantial resources to combat the repeated attacks on mail-in voting by President Trump and other members of his administration."  Decl. of Hector Sanchez Barba ¶ 26 (Barba Decl.) (ECF No. 2-2).

Based on their claims of injury, and relying solely on their VRA claim, *see* Mem. of Law in Supp. of  Pls.' Mot. for Temp. Restraining Order, Prelim. Inj., and Speedy Decl. Judg. at 25-35 ("Pls.' Mem.") (ECF No. 2-1), Plaintiffs now move for a "speedy" declaration under Federal Rule of Civil Procedure 57 that Defendants' alleged actions and statements "constitute unlawful voter intimidation in violation of Section 11(b)" of the VRA, Pls.' Proposed Order ¶ 7 (ECF No. 2-6). Plaintiffs also ask the Court to enter a six-part injunction that would: (1) regulate the content of Defendant Trump's speech at the height of a political campaign for the Presidency, by enjoining him from "encouraging his supporters" to take any actions, and from using "official White House public communications channels" (including the President's Twitter account) to make any statements or

suggestions, that Plaintiffs might regard as voter intimidation, *id.* ¶¶ 1, 6; (2) preemptively regulate the purposes for which, and the locations at which, the President, Attorney General, and Acting Secretary of Homeland Security may deploy federal law enforcement agents, *id.* ¶¶ 2-4; and (3) prohibit Defendants from taking unspecified "actions" that "may" limit the speed or reliability of mail delivery between now and November 10, 2020, *id.* ¶ 5.  Plaintiffs have made no showing, nor could they, that would entitle them to such extraordinary relief.

First, Plaintiffs have not satisfied any of the factors necessary to obtain a temporary restraining order or preliminary injunction.  They have failed to meet the first and most important of these factors—demonstrating a likelihood of success on the merits of their claims—for numerous reasons.  To begin, Section 11(b) of the VRA, the sole legal basis on which their motion relies, does not create a private right of action to bring suit against officers of the United States.  Therefore, insofar as Plaintiffs seek relief against the official-capacity Defendants (*see* n.1, *supra*), their VRA claim is barred by sovereign immunity.  Additionally, Plaintiffs have not established their standing to sue.  The fears expressed by Plaintiffs Schwartz and Lopez of intimidation at the polls, of unspecified "scrutiny" or investigation by government officials should they vote by mail, and of equally unspecified acts by Defendants that could delay delivery of their mail-in ballots or prevent them from being counted, are speculative, conjectural, and unsupported by evidence.  As such, they are categorically insufficient to establish that Plaintiffs Schwartz and Lopez face certainly impending threats of injury to their right to vote.  Plaintiff MFV has not even alleged, much less shown, that Defendants' alleged conduct is impairing its ability to conduct its activities, that it has incurred excess costs as a result of Defendants' actions, or that it has standing to assert the rights of absent third-party voters.  Thus, none of the Plaintiffs has established standing to seek prospective relief.  Owing both to sovereign immunity and to Plaintiffs' lack of standing, the Court lacks jurisdiction even to reach the merits of Plaintiffs' VRA claim.

Even if Plaintiffs could establish subject-matter jurisdiction and a viable cause of action, their VRA claim lacks merit.  Plaintiffs base their allegations of voter intimidation on pure speculation, the independent actions of third parties, and—in many circumstances—alleged actions of Defendants that have no nexus to voting, let alone voter intimidation.  Notably, Plaintiffs provide no legal authority for their novel and expansive views of liability under Section 11(b), which attempt to recast plainly political rhetoric as voter intimidation.  Indeed, numerous courts have rejected Section 11(b) claims similar to the ones Plaintiffs raise here.  Plaintiffs also raise a host of allegations about such disparate subjects as federal law enforcement's response to the protests that followed in the wake of George Floyd's death, the President's use of the pardon power, and concerns about mail processing by the U.S. Postal Service.  None of these matters has any nexus to voting intimidation, let alone to a viable claim under Section 11(b).  And Plaintiffs' speculative concerns about federal law enforcement threatening or intimidating voters during the election is undermined by the fact that federal law already expressly prohibits the deployment of troops or armed personnel at any place where an election is held, unless necessary to repel an enemy of the United States.  Plaintiffs thus fail to establish a likelihood of success on the merits of their VRA claim.

The remaining factors that the Court must consider before entering a temporary restraining order or preliminary injunction also tip sharply in Defendants' favor.  Just as Plaintiffs' speculative and conjectural assertions of injury fail to demonstrate a real and immediate threat of harm sufficient to show standing, their claims fall even shorter of showing that certain, great, and irreparable injury will befall them without immediate injunctive relief.  The balance of equities also weighs against such relief.  There is no dispute, to be sure, that guaranteeing the right to vote is in the public interest.  But none of the conduct Plaintiffs have identified violates or suppresses that right.  If anything, the entry of an injunction here would significantly disserve the public interest.  Plaintiffs seek in part a follow-the-law injunction of a kind courts routinely deny as contrary to the public interest, in a case

where they have made no showing that Defendants intend to flout or disregard the laws in question, and instead level accusations regarding Defendants' supposed motives for doing so. In other respects, the proposed injunction raises serious First Amendment concerns by purporting to restrain a candidate for the Presidency, indeed the sitting President, from discussing matters related to the upcoming election, and separation-of-powers concerns by purporting to supervise Defendants' conduct of their law enforcement responsibilities. In sum, the balance of the equities weighs heavily against awarding the injunction that Plaintiffs envision.

Plaintiffs' motion suffers from several additional fatal infirmities. First, it seeks injunctive and declaratory relief against the President in his official capacity for non-ministerial acts. The Supreme Court and the D.C. Circuit have soundly rejected, on separation-of-powers grounds, the notion that a court can award such relief against a President, and Plaintiffs cite no precedent to the contrary. Second, Plaintiffs' proposed injunction fails to comply with Federal Rule of Civil Procedure 65 because, among other reasons, it imposes vague and indefinite requirements.

Finally, Plaintiffs' request for a speedy declaratory judgment is both premature and improper. Courts reject requests for speedy adjudication where, as here, defendants have not yet pleaded in response to the complaint. The request also is improper because—contrary to Plaintiffs' contention that compliance with the VRA presents a pure legal issue amenable to resolution by declaratory judgment—their own brief and proposed order make clear that this is a mixed question of fact and law that is ill-suited for early resolution without the benefit of factual development.

For all of these reasons, as elaborated below, the Court should deny Plaintiffs' motion.

## LEGAL STANDARDS

"The standard for issuance of the extraordinary and drastic remedy of a temporary restraining order or a preliminary injunction is very high." *Jack's Canoes & Kayaks, LLC v. Nat'l Park Serv.*, 933 F. Supp. 2d 58, 75 (D.D.C. 2013) (citation omitted). An interim injunction is "never

awarded as of right," *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 24 (2008), and "should be granted only when the party seeking the relief, by a clear showing, carries the burden of persuasion," *Cobell v. Norton*, 391 F.3d 251, 258 (D.C. Cir. 2004).  The moving party "must demonstrate '(1) a substantial likelihood of success on the merits, (2) that it would suffer irreparable injury if the injunction is not granted, (3) that an injunction would not substantially injure other interested parties, and (4) that the public interest would be furthered by the injunction.'" *Jack's Canoes*, 933 F. Supp. 2d at 75-76 (quoting *CityFed Fin. Corp. v. Office of Thrift Supervision*, 58 F.3d 738, 746 (D.C. Cir. 1995)).  When, as here, the Government is the opposing party, the third and fourth factors merge. *See Nken v. Holder*, 556 U.S. 418, 435 (2009).  The "first and most important factor" is whether the moving party has "established a likelihood of success on the merits." *Aamer v. Obama*, 742 F.3d 1023, 1038 (D.C. Cir. 2014).  "When a plaintiff has not shown a likelihood of success on the merits, [a court need not] consider the remaining factors." *Greater New Orleans Fair Hous. Action Ctr. v. HUD*, 639 F.3d 1078, 1088 (D.C. Cir. 2011).  The Supreme Court also has instructed that a preliminary injunction cannot issue on the basis of speculative or possible injury.  Rather, the moving party must establish that irreparable harm is "*likely* in the absence of an injunction." *Winter*, 555 U.S at 22.[2]

Federal Rule of Civil Procedure Rule 57 provides that a "court may order a speedy hearing of a declaratory-judgment action."  Fed. R. Civ. P. 57.  Whether to order a speedy hearing under Rule 57 is within the court's discretion.  *Wilton v. Seven Falls Co.*, 515 U.S. 277, 282 (1995).  "[D]istrict

---

[2] The D.C. Circuit has followed a "sliding-scale" approach to evaluating the temporary restraining order and preliminary injunction factors.  But in *Sherley v. Sebelius*, 644 F.3d 388, 393 (D.C. Cir. 2011), the Court of Appeals noted that *Winter* calls into question the viability of the sliding-scale approach.  The Court read "*Winter* at least to suggest if not to hold that a likelihood of success is an independent, free-standing requirement for a preliminary injunction" such that a "movant cannot obtain a preliminary injunction without showing both a likelihood of success and a likelihood of irreparable harm." *Id.* at 392-93.  *See also Singh v. Carter*, 185 F. Supp. 3d 11, 16-17 (D.D.C. 2016) (citing *In re Navy Chaplaincy*, 738 F.3d 425, 428 (D.C. Cir. 2013), for the proposition that all four prongs of the standard must be satisfied before injunctive relief can be granted).  In any event, regardless of which standard is applied, interim injunctive relief is inappropriate here.

courts have looked to various factors when considering whether to expedite proceedings under Rule 57," including whether: (1) expediting determination of the declaratory judgment "will streamline and narrow issues for discovery and trial, even if it will not entirely resolve the controversy"; (2) "the determination is largely one of law, and factual issues are not predominant"; and (3) there "are imminent or ongoing violations of important rights." *Cty. of Butler v. Wolf*, No. 2:20-cv-677, 2020 WL 2769105, at *2 (W.D. Pa, May 28, 2020); *GEC US 1 LLC v. Frontier Renewables, LLC*, No. 16-cv-1276-YGR, 2016 WL 3345456, at *6 (N.D. Cal. Jun. 16, 2016).  Moreover, a Rule 57 motion is premature where the defendant has not yet filed a responsive pleading.  *Perry v. Correct Care Sols., LLC*, No. 1:17-cv-586 (LO/IDD), 2017 WL 11519168, at *3 (E.D. Va. Jun. 2, 2017) (citation omitted); *Gardner v. Newsom*, No. 1:20-cv-00240, 2020 WL 4808696, at *1 (E.D. Cal. Jul. 10, 2020).

## ARGUMENT

### I.    PLAINTIFFS ARE NOT LIKELY TO SUCCEED ON THE MERITS OF THEIR CLAIM.

#### A.  The Court Lacks Subject-Matter Jurisdiction Over Plaintiffs' VRA Claim.

##### 1.  Plaintiffs' VRA Claim Against the Official-Capacity Defendants Is Barred by Sovereign Immunity, Because Section 11(b) Contains No Express Private Right of Action Against Officers of the United States.

The Court must deny Plaintiffs' requests for temporary and preliminary injunctive relief "first and most important[ly]" because their VRA claim against the official-capacity Defendants has no likelihood of success on the merits. *Aamer*, 742 F.3d at 1038.  This is so for a number of reasons, the first being that sovereign immunity bars the claim.

"The United States, as sovereign, is immune from suit save as it consents to be sued . . . , and the terms of its consent to be sued in any court define that court's jurisdiction to entertain the suit." *United States v. Sherwood*, 312 U.S. 584, 586 (1941).  Private parties simply cannot sue the United States, its agencies, or its officers in their official capacities without identifying a statutory waiver of the Government's immunity.  *Sierra Club v. Wheeler*, 956 F.3d 612, 616 (D.C. Cir. 2020)

(citing *FAA v. Cooper*, 566 U.S. 284, 290 (2012) (collecting cases)); *see Kentucky v. Graham*, 473 U.S. 159, 165-66 (1985). A waiver must be "unequivocally expressed in the statutory text and will not be implied." *Lane v. Pena*, 518 U.S. 187, 192 (1996). Courts must read language purported to effect a waiver of sovereign immunity narrowly, and strictly construe any ambiguities in the statutory text in favor of preserving immunity. *Cooper*, 566 U.S. at 290; *Sierra Club*, 956 F.3d at 616.

Plaintiffs point to no statute expressly authorizing suits against the United States or its officers to enforce the terms of Section 11(b). Certainly, no such waiver of immunity can be found in Section 11(b) itself. Section 11(b) provides that:

> No person, whether acting under color of law or otherwise, shall intimidate, threaten, or coerce, or attempt to intimidate, threaten, or coerce any person for voting or attempting to vote, or intimidate, threaten, or coerce, or attempt to intimidate, threaten, or coerce any person for urging or aiding any person to vote or attempt to vote, or intimidate, threaten, or coerce any person for exercising any powers or duties under section 10302(a), 10305, 10306, or 10308(e) of this title or section 1973d or 1973g of title 42.

As the foregoing text reveals, Section 11(b) includes no express mechanism of its own for enforcement of its terms. Rather, Congress located tools for enforcement of rights secured by the VRA (including Section 11(b)) in Section 12 of the Act, 52 U.S.C. § 10308, which provides that violations of the Act may be criminally prosecuted, *id.* § 10308(a)-(c), and that the Attorney General may bring civil actions for injunctive relief against persons who have engaged in or are about to engage in conduct prohibited by the Act. *Id.* § 10308(d). Congress declined to include a provision in Section 12, however, for private-party suits. Thus, the VRA incorporates no express private right of action to enforce Section 11(b) at all, much less a right to bring suit against Federal officials.

Plaintiffs identify nothing in the text of Section 11(b), or the VRA generally, to suggest otherwise. Instead they cite *Allen v. State Bd. of Elections*, 393 U.S. 544 (1969), as support for their assumption that Section 11(b) itself "provides a private right of action to pursue declaratory and injunctive relief against official and private actors who engage in voter intimidation." Pls.' Mem.

at 25.  But *Allen* does not so neatly dispose of this question as Plaintiffs suggest.  *Allen* held that

Section 5 of the VRA, which also contains no express cause of action, nevertheless implies a right of

action to enforce its terms.  393 U.S. at 554-57.  The Court reasoned that inferring a private cause of

action under Section 5 was "consistent with the broad purposes of the Act" and necessary to

guarantee its "promise."  *Id.* at 557.  *See also Morse v. Republican Party of Va.*, 517 U.S. 186, 231-34

(1996) (plurality opinion) (relying on *Allen* to infer private right of action under VRA Section 10); *id.*

at 240 (Breyer, J., concurring); *but see Ziglar v. Abbasi*, 137 S. Ct. 1843, 1855-56 (2017) (calling into

question *Allen's* mode of analysis).  Whether Section 11(b) also creates an implied right of action

remains an open question, on which lower courts have divided.  *See, e.g.*, *League of United Latin Am.*

*Citizens v. Richmond Region Council 4614 v. Pub. Interest Legal Found.*, No. 1:18-cv-423, 2018 WL

3848404, at *3 (E.D. Va. Aug. 13, 2018) (recognizing a private cause of action); *Dorsey v. Barber*, No.

5:04-cv-2151, 2005 WL 2211176, at *7 (N.D. Ohio Sept. 9, 2005) (expressing skepticism), *rev'd in part*

*on other grounds*, 517 F.3d 389 (6th Cir. 2008); *Pincham v. Ill. Judicial Inquiry Bd.*, 681 F. Supp. 1309,

1314 (N.D. Ill. 1988) (merely assuming *arguendo*), *aff'd*, 872 F.2d 1341 (7th Cir. 1989).

      In the final analysis, however, it matters little for purposes of this action whether Section

11(b) implicitly creates a private right of action.  Whether it does so or not, Section 11(b) cannot

impliedly raise a cause of action *against the United States or its officers*, as by definition rights of action

against the sovereign cannot be implied.  They must be unequivocally expressed in statutory text.

*Cooper*, 566 U.S. at 290; *Lane*, 518 U.S. at 192.  Section 11(b) simply lacks the requisite expression of

legislative intent to permit suit against the Federal Government.  Indeed, it "'makes no mention

whatsoever' of the federal government," an omission that itself precludes a finding of an

"unambiguous waiver of the federal government's sovereign immunity[.]"  *Sw. Power Admin. v.*

*FERC*, 763 F.3d 27, 32 (D.C. Cir. 2014) (quoting *Lane*, 518 U.S. at 192).  Instead, by its terms

Section 11(b) proscribes voter intimidation by any "person," a term which by "longstanding

interpretive presumption . . . does not include the sovereign." *Return Mail, Inc. v. USPS*, 139 S. Ct. 1853, 1861-62 (2019) (quotation omitted).  That presumption is "particularly applicable where," as here, "it is claimed that Congress has subjected the [sovereign] to liability to which [it] had not been subject before."  *Id.* at 1863 (quotation omitted).[3]

Simply put, Section 11(b) contains no unequivocal statutory expression of legislative intent to submit the Federal Government to suit by private parties.[4]  Sovereign immunity therefore erects an insurmountable jurisdictional barrier to Plaintiffs' VRA claim against the official-capacity Defendants.  *See FDIC v. Meyer*, 510 U.S. 471, 475 (1994).[5]

---

[3]  To be sure, Section 11(b), by its terms, applies to all persons "whether acting under color of law or otherwise," and thus extends its reach to government actors.  But it does not specify whether Congress meant to include Federal officials as well as officers of State and local governments.  That ambiguity must be resolved in favor of preserving the Federal Government's immunity.  *Cooper*, 566 U.S. at 290; *Sw. Power Admin*, 763 F.3d at 31.  And while legislative history "cannot supply a waiver that is not clearly evident from the language of the statute," *Cooper*, 566 U.S. at 290 (citing *Lane*, 518 U.S. at 192), the legislative history of the VRA confirms that Congress was concerned with safeguarding citizens' right to vote against deprivations by State, not Federal Government, officials.  *See South Carolina v. Katzenbach*, 383 U.S. 301, 309-15 (1966) (summarizing the "voluminous legislative history of the Act contained in the committee hearings and floor debates").  The legislative history therefore weighs even further against construing Section 11(b) as applying to Federal officials.

[4]  The Administrative Procedure Act's waiver of sovereign immunity, 5 U.S.C. § 702, does not unlock the door to Plaintiffs' suit.  Because the VRA "contains its own self-executing remedial scheme," 52 U.S.C. § 10308, a court must "look only to that statute to determine whether Congress intended to subject the United States" to suit.  *United States v. Bormes*, 568 U.S. 6, 11 (2012).  Section 14(b) of the VRA, 52 U.S.C. § 10310(b), contains a waiver of immunity for private-party suits seeking declaratory judgments under Sections 4 and 5 of the Act, and injunctions against Federal officials to prevent their "execution or enforcement of any provision" of the Act.  *See Shelby Cty. v. Holder*, 43 F. Supp. 3d 47, 55-56 (D.D.C. 2014) (recognizing Section 14(b) as a partial waiver of sovereign immunity), *aff'd*, 799 F.3d 1173 (D.C. Cir. 2015).  Plaintiffs do not seek such relief in this action, however, and so Section 14(b), like Section 702, does not apply here.

[5]  It should come as no surprise that Congress has not seen fit to authorize private-party suits against federal officers under the VRA.  Decisions concerning civil and criminal enforcement of the VRA, including the formulation of policies and determination of priorities that guide the exercise of that discretion in individual cases, are committed to the exclusive and absolute discretion of the Attorney General.  52 U.S.C. § 10308(a)-(d); *see Heckler v. Chaney*, 470 U.S. 821, 831-32 (1985) ("[A]n agency's decision not to prosecute or enforce, whether through civil or criminal process, is a decision generally committed to an agency's absolute discretion.").  A suit to compel the Attorney General to initiate proceedings to enforce the VRA in an individual case or cases would be barred under the Administrative Procedure Act ("APA").  *Chaney*, 470 U.S. at 832 ("[A]n agency's decision

## 2. Plaintiffs Lack Standing.

The Court also lacks subject-matter jurisdiction over Plaintiffs' VRA claim because Plaintiffs allegations fail to establish their standing.  To ensure the proper role of the judiciary in a government of separated powers, "Article III of the Constitution limits federal courts' jurisdiction" to the adjudication of "'Cases' and 'Controversies.'" *Clapper v. Amnesty Int'l USA*, 568 U.S. 398, 408 (2013).  "[A]n essential and unchanging part of the case-or-controversy requirement" is that would-be suitors must have "standing to invoke the authority of a federal court[,]" *DaimlerChrysler Corp. v. Cuno*, 547 U.S. 332, 342 (2006), assuring they have a "personal stake in the outcome of [a] controversy" that "justif[ies] exercise of the court's remedial powers on [their] behalf." *Town of Chester v. Laroe Estates, Inc.*, 137 S. Ct. 1645, 1650 (2017).  Standing therefore, like sovereign immunity, is a "threshold jurisdictional question[,]" *Steel Co. v. Citizens for a Better Env't*, 523 U.S. 83, 102 (1998), determining "the power of the court to entertain the suit," *Warth v. Seldin*, 422 U.S. 490, 498 (1975).

To establish Article III standing, Plaintiffs "must have (1) suffered an injury in fact, (2) that is fairly traceable to the challenged conduct of the defendant, and (3) that is likely to be redressed by a favorable judicial decision." *Spokeo, Inc. v. Robins*, 136 S. Ct. 1540, 1547 (2016).  When a plaintiff seeks prospective relief, the "threatened injury must be certainly impending to constitute injury in fact;" "[a]llegations of possible future injury are not sufficient." *Amnesty Int'l*, 568 U.S. at 409.  A "theory of standing, which relies on a highly attenuated chain of possibilities, does not satisfy" this requirement.  *Id.* at 410.  "The plaintiff, as the party invoking federal jurisdiction, bears the burden of establishing these elements," and therefore "must clearly . . . allege facts demonstrating each

---

not to take enforcement action should be presumed immune from judicial review under" the APA). The Government's absolute prosecutorial discretion in matters involving the VRA would be circumscribed if parties such as Plaintiffs here, though lacking an APA cause of action, could bring suit to hold the United States liable under the VRA simply because the Government does not view or apply the VRA as they might prefer.

element." *Spokeo*, 136 S. Ct. at 1547 (quoting *Warth*, 422 U.S. at 518).

In addition to "'constitutional limitations on federal-court jurisdiction,'" the standing inquiry "involves . . . 'prudential limitations on its exercise.'" *Kowalski v. Tesmer*, 543 U.S. 125, 128-29 (2004) (quoting *Warth*, 422 U.S. at 498). Among these prudential limitations is "the rule that a party 'generally must assert [its] own legal rights and interests, and cannot rest [its] claim to relief on the legal rights or interests of third parties.'" *Id.* at 129 (quotation omitted); *Valley Forge Christian Coll. v. Ams. United for Separation of Church & State, Inc.*, 454 U.S. 464, 474 (1982).

### a. Plaintiffs Schwartz and Lopez

Plaintiffs Schwartz and Lopez are registered voters residing in Philadelphia, Pennsylvania and Houston, Texas, respectively. They allege that they are afraid to cast their votes in person, drop off their ballots at polling places, or vote by mail because of (i) harassment or intimidation by third parties, (ii) legal action that may be taken against them, and (iii) rejection of their mailed-in ballots, that they fear may occur because of statements made and actions taken by the Defendants, many of them over four months ago. These fears of possible future injury are far too speculative and conjectural to satisfy Article III's requirement that a threatened injury be "certainly impending." *Amnesty International*, 568 U.S. at 409.

Ms. Schwartz attests that if she goes to the polls to vote in person or drop off her ballot, she is afraid "the Proud Boys," or other "white supremacists," "will threaten [her] personal safety and local law enforcement will not protect [her]." Schwartz Decl. ¶¶ 24, 25. She bases these fears on President Trump's statements calling for law and order in Philadelphia once looting broke out among last summer's protests against the death of George Floyd, *id.* ¶ 6; her fear that Philadelphia police officers who used tear gas and made other reported "attacks" against certain protesters "were acting in support of [President] Trump," *id.* ¶¶ 8-13; the presence of "local vigilantes" who had gathered in her neighborhood during the protests, and whom she "understood" to be "white

supremacists," *id.* ¶¶ 14-15; the President's alleged "encouragement" to "supporters" to monitor the polls in Philadelphia for "bad things," *id.* ¶¶ 19; 22 and other statements by the President that she took as encouragement to law enforcement and local vigilantes "to be particularly vigilant [for] and confrontational with anyone . . . [who] might be against Trump," *id.* ¶ 23; *see id.* ¶¶ 16-22.

Ms. Schwartz says that she also is "afraid" to vote by mail, *id.* ¶ 26, because of statements by the President and the Attorney General regarding the potential of mail-in voting for fraud, *id.* ¶¶ 27-32, and news coverage of "changes to the [USPS]" that she "understood . . . to be aimed at reducing or even stopping mail-in voting," *id.* ¶¶ 34-37. Because of these statements, and actions she attributes to the President, she is "afraid that [her] mail-in ballot will not be counted or may even create some baseless legal investigation or action against [her] for voter fraud." *Id.* ¶ 33.

None of these statements of what Ms. Schwartz fears—no matter how genuine these fears are to her—is sufficiently "real and immediate" to establish "certainly impending" injury. *Amnesty Int'l*, 568 U.S. at 410. Instead, as was the case in *Amnesty International*, her fears rest on a "speculative chain of possibilities," *id.* at 414, wholly lacking in support. She harbors concerns that if she votes in person or drops off her ballot at the polls, Philadelphia police will allow the Proud Boys, or presumed "white supremacists" whom she observed during last summer's protests, to threaten her. Schwartz Decl. ¶¶ 24, 25. Yet neither Ms. Schwartz, nor the other Plaintiffs, present evidence: (1) that members of the Proud Boys, or of other white supremacist organizations, are actually located in Philadelphia; (2) that such organizations, wherever located, have been monitoring Philadelphia polling places, or behaving in a confrontational or threatening manner at these locations, since early voting began in Philadelphia on September 29, 2020; (3) that such organizations, will be monitoring the polls in Philadelphia—including in Ms. Schwartz's precinct— on election day, simply because of allegedly "encouraging" statements by the President; or (4) that the Philadelphia police would allow such organizations or their members to engage in unlawful acts

of violence or intimidation at the polls, simply because of their political support (as Ms. Schwartz assumes) for the President.

Similarly, neither Ms. Schwartz nor the other Plaintiffs offer evidence from which the Court could find that local election officials will refuse to count valid mail-in ballots, including hers, simply because of public statements by the President and the Attorney General regarding voter fraud, or evidence that she faces a credible threat of prosecution, or investigation, by unspecified federal, state, or local officials if she submits a valid mail-in ballot. Her "concern" that her ballot might not be counted, even if timely mailed, because of "a slowdown of mail service" at the President's direction, is not only just as speculative, but also is affirmatively refuted by at least a half-dozen recently entered injunctions preventing the Postal Service from making any changes in service that would slow the handling of election mail.[6]

Likewise, the fears and concerns articulated by Ms. Lopez, no matter how real to her, are also insufficiently concrete to establish a certainly impending injury to her right to vote. Ms. Lopez explains that she has decided she must vote by mail because her asthma places her at heightened risk of complications from COVID-19. Lopez Decl. ¶¶ 16-20. She states that Defendants have made her "very nervous about doing so," *id.* ¶¶ 3, 20, for four reasons: (1) because of alleged statements by President Trump "that the courts will review mail-in ballots," she is "worried" that her application for a mail-in ballot will be "unduly scrutinized" and "submitted to a court for inspection," *id.* ¶ 21; (2) she is "scared to deposit [her] ballot at a drop-off box," because the

---

[6] *See, e.g., Vote Forward v. DeJoy*, No. 20-2405, 2020 WL 5763869 (D.D.C. Sept. 28, 2020) (enjoining policy concerning late and extra trips by USPS that allegedly would have delayed the handling of election mail); *New York v. Trump*, No. 20-cv-2340, 2020 WL 5763775 (D.D.C. Sept. 27, 2020) (enjoining certain USPS policies that could have an impact on the handling of election mail); *Richardson v. Trump*, No. 20-2262, 2020 WL 5627002 (D.D.C. Oct. 8, 2020) (same); *Jones v. USPS*, No. 20-CIV-6516, 2020 WL 5627002 (S.D.N.Y. Sept. 21, 2020) (same); *Washington v. Trump*, No. 1:20-CV-03127-SAB, 2020 WL 5568557 (E.D. Wash. Sept. 17, 2020) (same); *Pennsylvania v. DeJoy*, No. 20-4096, 2020 WL 5763553 (E.D. Pa. Sept. 28, 2020) (same).

President has "threaten[ed]" to have law enforcement present at polling places (which she finds "intimidating") and has "encourage[d] his supporters" to act as poll watchers in language that makes her "feel" and "think" he wants them to be violent, *id.* ¶¶ 24-32; (3) she is "nervous about" voting by mail because "Trump's attacks on the Postal Service" have undermined her confidence that her ballot would arrive on time, *id.* ¶¶ 33-34; and (4) because she has observed unspecified statements by the President "suggest[ing]" "that he might take actions," also unspecified, "to prevent the counting of all absentee ballots," she is concerned her ballot may not be counted, *id.* ¶ 35.

Ms. Lopez's alleged worries and concerns and her reasons for them, like Ms. Schwartz's, rest on "a highly attenuated chain of possibilities" that is categorically inadequate to establish her standing. *Amnesty Int'l*, 568 U.S. at 410. Neither Ms. Lopez nor the other Plaintiffs offer evidence that Harris County, Texas officials will "unduly scrutinize" either ballots or ballot applications, or submit them for inspection to a court, simply because of statements made by the President (who exercises no authority over their conduct of their duties), or that she has reason to fear she would suffer any consequences as a result. Likewise, Plaintiffs offer no evidence that "law enforcement" have been or will be present at Ms. Lopez's drop-off location, or that she has objective reason to be "intimidated" by them if they are; that supporters of the President have shown up or will show up as poll watchers at her drop-box location; or that they have acted or will act violently, just because she thinks the President wants them to. Ms. Lopez does not describe what actions the President "might take," or even could take, to prevent the counting of absentee ballots in Harris County, or submit objective evidence of any intent by the President to take such actions, whatever they might be. And her lack of "confidence" that her mail-in ballot would be delivered on time because of the President's so-called "attacks" on and "rants" against the Postal Service is no more warranted than Ms. Schwartz's, in light of the multiple injunctions prohibiting USPS from changing its operations in ways that could impede the delivery of election mail.

It is also noteworthy, moreover, that neither Ms. Schwartz nor Ms. Lopez states that she has decided *not* to vote because of her fears and concerns about doing so.  *See* Schwartz Decl. ¶ 39; Lopez Decl. ¶ 36.  But even had Mss. Schwartz and Lopez decided to refrain from voting, to avoid feared encounters with vigilantes, or "investigation" by law enforcement officials, *Amnesty International* would still preclude a finding of standing that would allow them to seek the injunctive relief they now ask of this Court.

In *Amnesty International*, plaintiffs who sought to contest the constitutionality of suspected Government surveillance of their communications attempted to establish their standing on the basis that the risk of surveillance had forced them to take "costly and burdensome measures to protect the confidentiality of their communications," including forbearance from certain communications altogether.  568 U.S. at 415.  The Supreme Court rejected this theory of injury, holding that the plaintiffs could not "manufacture standing merely by inflicting harm on themselves based on their fears of hypothetical future harm that is not certainly impending."  *Id.* at 416.  "Because [the plaintiffs] d[id] not face a threat of certainly impending" surveillance, the costs they incurred to avoid surveillance were "self-inflicted injuries" attributable only to their own subjective fears, and as such were "insufficient to create standing."  *Id.* at 417-18 (discussing *Laird v. Tatum*, 408 U.S. 1, 10-15 (1972) (holding that "[a]llegations of a subjective 'chill' are not an adequate substitute for a claim of specific present objective harm or a threat of specific future harm")).

So too, here.  Plaintiffs may act on their stated concerns as they will, to vote in person, vote by mail, or to abstain from voting at all.  But to refrain from voting based on subjective and unsubstantiated fears, rather than genuine threats of specific future harm, does not constitute Article III standing.  *Id.* at 418.  *See also Food & Water Watch, Inc. v. Vilsack*, 808 F.3d 905, 919 (D.C. Cir. 2015) (citing *Amnesty Int'l*, 568 U.S. at 417-18); *Bernstein v. Kerry*, 962 F. Supp. 2d 122, 127 (D.D.C. 2013) (finding "no legal support for the view that a subjective emotional response to the

possibility of an invasion of a legally-protected interest constitutes an injury-in-fact" and "a host of cases which hold just the opposite").

Of course, the VRA guarantees Plaintiffs Schwartz and Lopez the right to cast their ballots free from genuine threats and interference, and an "invasion" of that statutorily protected interest would be sufficient to "create[ ] standing." *Spokeo*, 136 U.S. at 1549; *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 578 (1992). Equally so, however, no statute can erase the irreducible constitutional minimum of a concrete injury in fact. *Spokeo*, 136 S. Ct. at 1547-48, 1549. In this instance, Plaintiffs Schwartz's and Lopez's subjective fears do not meet that minimum requirement. They have not established a real and immediate threat of injury to their right to vote that entitles them to invoke the authority of a federal court. Without such injury they lack both standing and, thus, cannot establish a possibility of success on their VRA claim.

### b.  Mi Familia Vota

Plaintiff MFV also has failed to establish both Article III and third-party standing to sue.

When an entity attempts to sue in its organizational capacity, it must establish Article III standing in the same manner as an individual. *People for the Ethical Treatment of Animals v. USDA*, 797 F.3d 1087, 1093 (D.C. Cir. 2015) ("PETA"). At a minimum, the organization, "like an individual plaintiff," must "show 'actual or threatened injury in fact that is fairly traceable to the alleged illegal action and likely to be redressed by a favorable court decision.'" *Id.* (quotation omitted).

To satisfy the injury-in-fact requirement, an organization must show a "concrete and demonstrable injury to [its] activities." *Am. Soc'y for Prevention of Cruelty to Animals v. Feld Entm't, Inc.*, 659 F.3d 13, 25 (D.C. Cir. 2011) (quoting *Havens Realty Corp. v. Coleman*, 455 U.S. 363, 379 (1982)). The D.C. Circuit applies a two-part test for making that determination. *See PETA*, 797 F.3d at 1094. To start, the court asks "whether the defendant's allegedly unlawful activities injured the plaintiff's interest in promoting its mission." *Feld Entm't*, 659 F.3d at 25 (citing *Equal Rights Ctr., v. Post Prop.,*

*Inc.*, 633 F.3d 1136, 1140 (D.C. Cir. 2011).  If so, the court proceeds to consider whether the organization has "diver[ted] its resources . . . to counteract" the challenged conduct.  *Equal Rights Center*, 633 F.3d at 1140; *see PETA*, 797 F.3d at 1094 (quotations omitted).  MFV has not satisfied either element of this test.

An organization is not injured merely because "the challenged conduct affects [its] activities"; rather, it must show that the conduct "will actually impair [its] activities."  *Feld Entm't*, 659 F.3d at 25.  To meet this requirement, a plaintiff "must allege that the defendant's conduct perceptibly impaired the organization's ability to provide services."  *Food & Water Watch*, 808 F.3d at 919; *see also Abigail All. for Better Access to Dev. Drugs v. Eschenbach*, 469 F.3d 129, 133 (D.C. Cir. 2006).  Impairment occurs "when the defendant's conduct causes an inhibition of [the organization's] daily operations."  *Food & Water Watch, Inc.*, 808 F.3d at 919 (quoting *PETA*, 797 F.3d at 1094).

MFV has not demonstrated that Defendants' alleged conduct has impaired its operations or its ability to provide its services.  MFV contends that because of Defendants' alleged voter intimidation, it has recalibrated its advocacy efforts to focus on educating "voters about mail-in voting and voting restrictions that Defendants have implemented or advocated for."  Compl. ¶ 8.  MFV, however, has failed to demonstrate that this supposed shift in emphasis is inconsistent with or impairs the organization's normal activities and objectives.  In fact, MFV expressly states in its declaration that in addition to voter registration efforts, the organization "typically devote[s] significant resources to get out the vote campaigns and efforts to educate members of our communities on issues that are important in the upcoming election."  Barba Decl. ¶ 7.  The supposed alterations in the organization's activities to account for Defendants' alleged improprieties appear to be wholly consistent with its previous voter advocacy efforts.  Put another way, MFV states that it has historically engaged in voter education and get out the vote campaigns prior to past

elections, and it continues those same efforts without apparent impairment in the lead-up to the

2020 presidential election.  Indeed, MFV expressly confirms that it has "continued [its] voter

registration efforts[.]"  *Id.*  ¶ 27.  Thus, MFV can hardly argue that the organization's activities have

been impeded when it continues to engage in those same activities.

The D.C. Circuit has reached the same conclusion when the challenged conduct does not

directly impair an organization's activities, even if the conduct makes the organization's activities less

efficient or effective.  *See, e.g., Nat'l Treasury Emps. Union v. United States* ("*NTEU*"), 101 F.3d 1423,

1430 (D.C Cir. 1996); *Food & Water Watch, Inc.*, 808 F. 3d at 919-21.  In *NTEU*, a labor union

alleged that the Line Item Veto Act caused it to spend additional funds lobbying the President to

achieve its desired policies.  101 F.3d at 1430.  But the Act did not prevent the union from lobbying

or force it to change its normal course of operations; it merely "made [its] activities more difficult."

*Id.*  Similarly, the plaintiff organization in *Food & Water Watch* alleged that an Agriculture

Department regulation caused it to expend greater resources advocating for educating the public

about food safety.  808 F.3d at 919-21.  The D.C. Circuit held that the plaintiff did not establish an

injury for purposes of standing, because the challenged regulation did not prevent the organization

from engaging in these activities or otherwise inhibit its "daily operations."  *Id.* at 919 (quoting

*PETA*, 797 F.3d at 1094).  Therefore, to the extent MFV merely contends that some of its efforts

have been rendered less effective in the run-up to this year's presidential election, it has failed to

establish that its activities have been impeded by the Defendants' alleged actions.  The Court may

find a lack of standing on this basis alone.  *See id.*

The D.C. Circuit's test for organizational injury also requires MFV to show that it "diver[ted]

its resources … to counteract" Defendants' alleged conduct.  *Equal Rights Center*, 633 F.3d at 1140.

To meet this requirement, MFV must demonstrate that it has incurred "operational costs beyond

those normally expended" to carry out its mission.  *Nat'l Ass'n of Home Builders v. EPA*, 667 F.3d 6, 12 (D.C. Cir. 2011).  Again, MFV's submissions fall short.

First, MFV's decision to reapportion its funds to voter education services does not meet this test.  *See* Compl. ¶ 8; Barba Decl. ¶ 27.  MFV acknowledges in its declaration that the organization engages in a number of community-based activities.  *See* Barba Decl. ¶ 3 ("Our work focuses primarily on six issues: immigration, education, environmental justice, worker's rights, healthcare, and voting rights."); *see also id.* ¶ 8 (identifying a variety of activities such as providing education services in climate justice and immigration justice).  But MFV's voluntary decision to reallocate resources away from its other non-voter advocacy services to bolster voter education does not constitute an injury that confers standing.  Indeed, the D.C. Circuit has explained that such voluntary decisions about how to allocate funds—*i.e.*, choosing to expand voter education at the expense of, for example, promoting climate justice—should be "considered a 'self-inflicted' budgetary choice," not "an injury in fact for purposes of standing."  *Feld Entm't*, 659 F.3d at 25 (quotation omitted).

Second, MFV does not assert that a diversion of resources has undermined its objective of "helping people vote."  Barba Decl. ¶ 38.  *See Int'l Acad. of Oral Med. & Toxicology v. FDA*, 195 F. Supp. 3d 243, 257 (D.D.C. 2016) (noting that the plaintiff organization had "not identified any specific projects that [it] had to put on hold or otherwise curtail").  Quite to the contrary, MFV claims it has strengthened its voter advocacy efforts by educating voters about mail-in voting and other issues allegedly facing the electorate during the current presidential election cycle.  Barba Decl. ¶ 27.  And in fact, MFV acknowledges that the organization has "continued [its] voter registration efforts," notwithstanding the group's purported enhancement of its voter education programs.  *Id.*

Third, MFV does not allege that it has incurred costs from its heightened voter advocacy efforts beyond its normal budgetary allocations.  *See generally* Barba Decl. ¶¶ 26-27; Compl. ¶ 8.

"[A]n organization does not suffer an injury in fact where it 'expend[s] resources to educate its members and others' unless doing so subjects the organization to 'operational costs beyond those normally expended.'" *Food & Water Watch*, 808 F.3d at 919-20 (quotation omitted). Here, MFV asserts that it has redirected funds from other, unidentified educational programs in favor of its voter advocacy efforts. Barba Decl. ¶ 27. MFV does not, however, claim that the change in its priorities has caused "operational costs beyond" those that it ordinarily incurs. *See generally id.* ¶¶ 26-27; Compl. ¶ 8. For all of the foregoing reasons, MFV has not established Article III standing.

MFV also lacks third-party standing to bring a Section 11(b) claim. *See Tesmer*, 543 U.S. at 128-29. MFV does not allege, and as an organization it could not allege, that it has been subjected to "intimidat[ion] for voting or attempting to vote." 52 U.S.C. § 10307(b).[7] Rather, MFV seeks to maintain a claim of voter intimidation on behalf of third-party voters who are not parties to this lawsuit. But it has not met the requirements for doing so.

A plaintiff may overcome the rule against third-party standing only when that plaintiff shows: (1) that it has Article III standing in its own right; (2) a close relationship between itself and the absent parties whose rights it seeks to assert; and (3) a hindrance to the third parties' ability to protect their interests. *See Powers v. Ohio*, 499 U.S. 400, 410-11, (1991); *Al-Aulaqi v. Obama*, 727 F. Supp. 2d 1, 23 (D.D.C. 2010). While the Supreme Court has been "forgiving with these criteria in certain circumstances" involving claims under the First Amendment, or when enforcement of a challenged restriction against the plaintiff would result indirectly in the violation of third parties' rights, *Tesmer*, 543 U.S. at 130, Plaintiffs' motion does not present either scenario. "Beyond these examples," the Supreme Court "ha[s] not looked favorably upon third-party standing." *Id.*

---

[7] Section 11(b) also prohibits intimidation "for urging or aiding any person to vote or attempt to vote." 52 U.S.C. § 10307(b). MFV does not allege, however, that it has been subjected to intimidation for its voter education and registration activities.

MFV fails to satisfy any of the requirements for third-party standing.  It has not met the threshold requirement that the organization itself suffer an Article III injury, as discussed above. *See supra* at 20-21.

Further, MFV does not allege, let alone show, that the organization has a "close relation" with absent members of the electorate whose rights the organization purports to assert.  *See Powers*, 499 U.S. at 410-11.  MFV does not attempt to identify third parties that it represents; instead the organization simply suggests that it has some sort of arms-length relationship with unnamed members of the voting public.  *See, e.g.*, Barba Decl. ¶ 28 ("A voter in North Las Vegas, Nevada"); *id.* ¶ 18 ("A voter in Henderson, Nevada"); *see also* Compl. ¶ 228 ("MFV has spoken to many voters in Latino communities who have been particularly impacted by Defendants' actions.").  While MFV identifies one individual by name, in no way does MFV attempt to establish that it has a close relationship with that person.  *See* Barba Decl. ¶ 16.  Thus, it has not demonstrated a close relationship with any of the absent third parties whose rights it purports to assert.

Finally, MFV has not established that absent third parties whose legal rights it seeks to assert somehow are hindered from protecting their own legal interests.  *Tesmer*, 543 U.S. at 130; *Powers*, 499 U.S. at 411.  In *Tesmer*, the Supreme Court rejected an argument that indigent, "unsophisticated," pro se criminal defendants would be "hindered" in challenging denials of their right to appellate counsel.  543 U.S. at 131-32.  Similarly, the D.C. Circuit in *American Immigration Lawyers Ass'n v. Reno*, 199 F.3d 1352, 1362-63 (D.C. Cir. 2000), rejected the proposition that overseas aliens face insurmountable barriers to bringing suit in the United States, such that third-party plaintiffs must be permitted to commence legal action on their behalf.  And in *Al-Aulaqi*, 727 F. Supp. 2d at 31-32, the district court determined that Anwar Al-Aulaqi's father lacked third-party standing to bring a lawsuit on his son's behalf, even though Al-Aulaqi remained in Yemen and was wanted by U.S. authorities. Under these precedents, MFV can hardly argue that unnamed members of the U.S. electorate

residing in this country are so hindered from protecting their own interests that they could not bring VRA suits of their own.  The presence of Mss. Schwartz and Lopez as plaintiffs in this action refutes the idea.  Thus, MFV has not establish third-party standing.

### c. Certain of Plaintiffs' Asserted Injuries Are Not Traceable To Defendants' Conduct

Even if Plaintiffs could establish Article III injury-in-fact, they cannot establish that some of their alleged harms are fairly traceable to the Defendants' alleged conduct.  The traceability prong of standing requires Plaintiffs to prove that their certainly impending injuries "fairly can be traced to the challenged conduct of the defendant, and not injury that results from the independent action of some third party not before the court." *Simon v. E. Ky. Welfare Rights Org.*, 426 U.S. 26, 41-42 (1976).  "Where plaintiffs' claim hinges on the failure of government to prevent another party's injurious behavior, the 'fairly traceable' and redressability inquires appear to merge.  In such cases, both prongs of the standing analysis can be said to focus on principles of causation:  fair traceability turns on the casual nexus between the agency action and the asserted injury, while redressability centers on a causal connection between the asserted injury and judicial relief." *Freedom Republicans, Inc. v. Federal Election Comm'n*, 13 F.3d 412, 418 (D.C. Cir. 1994) (citations omitted).

The Supreme Court repeatedly has "decline[d] to abandon [its] usual reluctance to endorse standing theories that rest on speculation about the decisions of independent actors." *Amnesty Int'l*, 568 U.S. at 414; *see also Defs. of Wildlife*, 504 U.S. at 561-62.  "[A] federal court [must] act only to redress injury that fairly can be traced to the challenged action of the defendant, and not injury from independent action *of some third party not before the court*." *Simon*, 426 U.S. at 41-42 (emphasis added); *see also Warth*, 422 U.S. at 506 (finding a lack of standing where alleged injury resulted from outside forces, "rather than . . . respondents' assertedly illegal acts").  In addition, mere encouragement by the defendant is insufficient to establish traceability.  *See Simon*, 426 U.S. at 42.

Here, Plaintiffs contend that "Defendants have publicly encouraged, counseled, or given the 'green light' to third parties to intimidate or attack" voters at the polls.  Pls.' Mem. at 28.  More specifically, Plaintiffs contend that the President has encouraged his supporters to show up at polling places and has refused to denounce white supremacist groups, and that these statements and actions violate Section 11(b) because fear of actions these third parties might take is intimidating Plaintiffs from, among other things, voting in person.  *Id.* at 28-29.  Putting aside the lack of legal support for the proposition that alleged third party violations of Section 11(b) can be imputed to a government official in the absence of a conspiracy,[8] Plaintiffs' alleged fears associated with the conduct of third parties cannot fairly be traced to the Defendants.  In addition, as previously explained, the Plaintiffs' speculation relies on attenuated assumptions, including here where it would primarily be state authorities that would exercise any law enforcement authority.

For example, Ms. Lopez expresses concern that the President's supporters and groups like the Proud Boys might go to polling places to watch people, and that this makes her nervous to vote using a drop box.  Lopez Decl. ¶¶ 27-32.  Whatever fear Ms. Lopez may have about using a drop box to vote cannot be fairly or reasonably attributed to the Defendants.  Rather, any potentially cognizable injury is fairly traceable to the actions of third parties.  Even if the Court were to issue

---

[8] The only support Plaintiffs provide for this novel proposition is inapposite.  Pls.' Mem. at 29-30 (citing *Dwares v. City of New York*, 985 F.2d 94 (2d Cir. 1993), *overruled on other grounds by Leatherman v. Tarant Cty. Narcotics Intelligence & Coordination Unit*, 507 U.S. 163, 164 (1993)).  In *Dwares*, a case that did not even mention the VRA, the Second Circuit held that plaintiff sufficiently had pled a conspiracy under 42 U.S.C. § 1983 where police officers had an agreement with "skinheads" not to interfere in any assaults they may engage in during a demonstration.  *Id.* at 99-100.  Here, the only conspiracy alleged in Plaintiffs' complaint is one between the Defendants and the President's reelection campaign, in a count of the complaint that is not relied on as a basis for Plaintiffs' motion and, in any event, lacks any factual support.  Compl. ¶ 240 ("Defendants have agreed and conspired with the Trump Campaign to prevent—by force, intimidation, and threat—citizens lawfully entitled to vote from giving their support or advocacy toward Trump's general election opponent in the 2020 general election.").

the injunction proposed by Plaintiffs, it would not redress their claimed injuries, as it would not

prevent third parties from continuing to engage in conduct that Plaintiffs claim is intimidating.

Similarly, Ms. Schwartz expresses concerns about the conduct of the Philadelphia police

during last summer's protests.  Schwartz Decl. ¶¶ 4-13.  She contends that President Trump

encouraged actions that the Philadelphia police took against protestors.  *Id.*  Even accepting Plaintiff

Schwartz's allegations as true, any claimed injury she may suffer would not be fairly attributable to

the Defendants, but rather could be attributed only to the conduct of the police themselves, and

could not be redressed through the issuance of an injunction against Defendants.

Ms. Schwartz also expresses concern that the President allegedly has encouraged "local

vigilantes" groups, such as the Proud Boys or the President's supporters, to be watchful at polling

places; consequently, she feared going to a polling place and instead decided to vote by mail.  *Id.* ¶¶

14-25.  Again, even if Ms. Schwartz's fears could constitute a cognizable injury-in-fact, they cannot

be attributed to the Defendants.  Rather, any alleged injury is fairly traceable to the potential actions

of these third parties, and her claimed injury cannot be redressed through Plaintiffs' requested

injunction against the Defendants.[9]

\* \* \*

In sum, both sovereign immunity and Plaintiffs' lack of standing leave Plaintiffs without

hope of success on the merits of their VRA claim.  *See Munaf v. Geren*, 553 U.S. 674, 690 (2008)

(observing that jurisdictional impediments even to reaching the merits make success on the merits

unlikely).  For this reason alone, Plaintiffs' request for temporary and preliminary injunctive relief

---

[9] The same holds true for some of the allegations made by MFV.  Mr. Barba contends that some
unidentified individuals have expressed concerns that supporters of the President and others may
engage in intimidation tactics at polling places, and that this may discourage them from voting in
person.  Barba Decl. ¶¶ 15-18.  Once again, even if this amounts to a cognizable injury, Plaintiffs
cannot establish that it is fairly traceable to Defendants rather than solely attributable to the possible
actions of third parties, or that such conduct could be redressed by an injunction in this case.

must be denied, regardless of any consideration of the remaining factors.  *Greater New Orleans Fair Hous. Action Ctr.,* 639 F.3d at 1088.

### B.   Plaintiffs Have Failed to Establish That Any of Defendants' Alleged Conduct Violates Section 11(b) of the VRA

If this Court had jurisdiction to reach the merits of Plaintiffs' Section 11(b) claim, they still could not meet their burden of demonstrating a likelihood of success.  Plaintiffs contend that Defendants have violated Section 11(b)'s prohibition against voter intimidation in two distinct ways: (1) by threats of violence; and (2) by disparagement and threats of enhanced scrutiny of mailed-in ballots.  Pls.' Mem. at 26-34.  Plaintiffs are wrong at each turn.

As noted, Section 11(b) forbids "intimidat[ing], threaten[ing], or coerc[ing], or attempt[ing] to intimidate, threaten, or coerce any person for voting or attempting to vote, . . . for urging or aiding any person to vote or attempt to vote, or . . . for exercising any powers or duties under" various other provisions of the VRA.  52 U.S.C. § 10307(b).  The contours of a Section 11(b) claim are not well established, due in part to the small number of cases that have been decided,[10] although it is clear is that "Section 11(b) cases can be extremely difficult to prove."  Civil Rights Div. Assistant Att'y Gen. Thomas E. Perez, *Statement Before the U.S. Comm'n on Civil Rights* (May 14, 2010), https://www.usccr.gov/pubs/NBPH/docs/Perez_05-14-2010.pdf (last visited Oct. 26, 2020).[11] Nevertheless, it is also clear Plaintiffs' Section 11(b) claim remains so speculative, attenuated, and incorrect as a matter of law and fact that their request for an injunction should be denied.

---

[10] *Compare, e.g., LULAC Richmond Reg'l Council 4614 v. Pub. Interest Legal Found.*, No. 1:18-cv-423, 2018 WL 3848404, at *3-4 (E.D. Va. Aug. 13, 2018) (rejecting a specific intent requirement), *with Parson v. Alcorn*, 157 F. Supp. 3d 479, 498 (E.D. Va. 2016) (requiring proof of intent).

[11] Also likely because of the "challenging legal standard of proof," under Section 11(b), *see Statement Before the U.S. Comm'n on Civil Rights*, Defendants have identified only one case where a plaintiff obtained relief in a contested case under Section 11(b) since Congress enacted the VRA in 1965.  *See Daschle v. Thune*, No. 4:04-cv-4177 (D.S.D. Nov. 2, 2004) (ECF No. 6) (granting TRO).

For example, in the week before the 2016 federal election, a litany of courts rejected similar Section 11(b) claims against party committees and political campaigns based on allegations analogous to the ones made here.[12]  Plaintiffs do not address, let alone distinguish, this uniform conclusion that alleged comparable language and conduct does not trigger Section 11(b) liability.

In addition, most speech on which Plaintiffs base their claim is too abstract or rhetorical to be actionable.  *See Watts v. United States*, 394 U.S. 705, 708 (1969) (distinguishing "political hyperbole" from a "true threat"); *Pa. Dem. Pty.*, 2016 WL 6582659, at *6 ("The First Amendment has its fullest and most urgent application to speech uttered during a campaign for political office.") (quoting *Citizens United v. FEC*, 558 U.S. 310, 339 (2010))).  The President's description of election monitors as an "Army for Trump," and his directive to supporters to "[w]atch those ballots" and "[w]atch all the thieving and stealing and robbing they do," Pls.' Mem. at 5-7 (citation omitted), are calls for supporters to exercise statutory rights to serve as election monitors or otherwise be vigilant regarding potential voting abuses.  *See, e.g.*, 25 Pa. Cons. Stat. § 2687(b) (authorizing partisan monitors in polling places).  But "simply arguing there is voter fraud and urging people to watch out for it is not, without more, sufficient to justify the extraordinary relief that an injunction constitutes."  *Ariz. Dem. Pty.*, 2016 WL 8669978 at *9; *see also Nev. State Dem. Pty.*, *supra* (declining to issue TRO but requiring defendants to submit specific poll watching plan for further review).[13]

---

[12] *See Ohio Dem. Pty. v. Ohio Repub. Pty.*, No. 16-4268, 2016 WL 6608962 (6th Cir. Nov. 6, 2016), *application to vacate stay denied*, 137 S. Ct. 15 (Nov. 7, 2016); *Ariz. Dem. Pty. v. Ariz. Repub. Pty.*, No. CV-16-3752, 2016 WL 8669978 (D. Ariz. Nov. 4, 2016); *Nev. State Dem. Pty. v. Nev. Repub. Pty.*, No. 2:16-cv-2514 (D. Nev. Nov. 4, 2016) (ECF No. 75); *N.C. Dem. Pty. v. N.C. Repub. Pty.*, No. 16-1288 (M.D.N.C. Nov. 7, 2016) (ECF No. 30); *Penn. Dem. Pty. v. Repub. Pty. of Penn.*, No. 16-5664, 2016 WL 6582659 (E.D. Pa. Nov. 7, 2016); *see also Mich. Dem. Pty. v. Mich. Repub. Pty.*, No. 16-13924 (E.D. Mich. Nov. 9, 2016) (ECF No. 16) (voluntary dismissal after relief denied); *cf. Dem. Nat'l Comm. v. Repub. Nat'l Comm.*, No. 81-3876, 2016 WL 6584915 (D.N.J. Nov. 5, 2016) (declining to extend consent decree).

[13] Such monitoring activities may be carried out without threatening or intimidating voters.  If election monitors do threaten or attempt to intimidate voters, a potentiality unproven here, specific acts of interference and intimidation are subject to criminal penalties under state and federal law.

Section 11(b) prohibits intimidation, threats, and coercion that interfere with voting rights, including "certain forms of harassment such as the bringing of spurious criminal charges," *Johnson v. Mississippi*, 488 F.2d 284, 287 (5th Cir. 1974), following minority voters and copying their license plates, *Daschle*, *supra*, and threatening minority voters with criminal prosecution for lawful voting activity, *United States v. N.C. Repub. Party*, No. 5:92-cv-161 (E.D.N.C. Feb. 27, 1992) (ECF No. 2). *See also United States v. McLeod*, 385 F.2d 738, 47 (5th Cir. 1967) (enjoining arrests and prosecutions of individuals conducting voter registration under predecessor statute). No comparable allegations have been made here.

Many of the remaining allegations against the Defendants are too attenuated from voting to fall within the ambit of Section 11(b). *See* 52 U.S.C. § 10310(c)(1) (defining "vote" and "voting" for purposes of the VRA). For example, the Attorney General's statement that "the voices of peaceful and legitimate protests have been hijacked by violent radical elements" and that the Department of Justice would mobilize resources to "identify criminal organizers and instigators," Att'y Gen. William P. Barr, *Statement on Riots and Domestic Terrorism* (May 31, 2020) (quoted in Pls.' Mem. at 8), *available at* https://www.justice.gov/opa/pr/attorney-general-william-p-barrs-statement-riots-and-domestic-terrorism (last visited Oct. 26, 2020), bears no relation to "voting," "attempting to vote," or "urging or aiding any person to vote or attempt to vote," 52 U.S.C. § 10307(b). Plaintiffs' contention that Acting Secretary Wolf "falsely portrayed" Antifa as a "terrorist network," Pls.' Mem. at 8; directed DHS agents to Portland, Oregon to protect the federal courthouse from attack from violent opportunists during protests, *id.* at 16; "directed federal law enforcement officials to make public comments sympathetic" to Kyle Rittenhouse, *id.* at 18-19; and did not deploy federal law

---

*See, e.g.*, 18 U.S.C. § 594; 25 Pa. Cons. Stat. § 3527; *see also Ohio Dem. Pty. v. Donald J. Trump for Pres.*, 137 S. Ct. 15 (Nov. 7, 2016) (Statement of Ginsburg, J.) (noting state law proscribing intimidation while voting to deny application to vacate stay of a Section 11(b) restraining order).

enforcement to stop confrontations at the Michigan Capital building in May 2020, *id.* at 19, also are untethered to voting, much less voting intimidation.  Similarly, the President's tweets concerning his support for Operation Legend, a surge of federal resources to fight violent crime, Pls.' Mem. at 15, cannot be linked to voting.  *Cf. Parson v. Alcorn*, 157 F. Supp. 3d 479, 498 (E.D. Va. 2016) (concluding that mere articulation of the law in a non-threatening manner does not violate Section 11(b), even if voters are uncomfortable with legal requirements).  Nor does the President's exercise of the pardon power, Pls.' Mem. at 19-20, bear a reasonable relationship to the act of voting, attempting to vote, or urging or aiding another person to vote.  Plaintiffs' allegations regarding the U.S. Postal Service, Pls.' Mem. at 12-13, similarly fall outside the scope of Section 11(b).  *Cf. Dem. Nat'l Comm. v. Bostelmann*, No. 20-cv-249, 2020 WL 5627186, at *28-29 (W.D. Wisc. Sept. 21, 2020) (concluding that Section 11(b) "appears [to be] a poor fit for analyzing" issues presented by the COVID-19 pandemic.).

Finally, Plaintiffs' speculative and factually unsupported concerns regarding federal law enforcement threatening or intimidating voters at the polls have not and will not come to pass. Although Plaintiffs make broad allegations regarding federal law enforcement officers' activities concerning recent protests and unrest, Pls.' Mem. at 15-17, 30-31, they fail to offer any factual basis to conclude that federal law enforcement officers will violate Section 11(b).  Instead, Plaintiffs offer mere speculation that those same activities may occur during the election.  The facts regarding elections definitively undermine their claim for preliminary relief.  It is not enough to argue that "[a]ny American who pays even modest attention to the news would interpret Defendants' stated plans for November in light of their past conduct."  Pls.' Mem. at 31.  It has been a federal crime for over a century to send "troops or armed men at any place where a general or special election is held,

unless such force be necessary to repel armed enemies of the United States," 18 U.S.C. § 592.[14]

Defendants are aware of no evidence that any federal law enforcement official has violated this

prohibition as to elections in the 2020 election cycle, and Plaintiffs offer none despite the fact that

early, absentee, and mail-in voting has commenced in many jurisdictions.  Thus, Plaintiffs are

unlikely to establish the factual basis for their Section 11(b) claim with respect to federal law

enforcement officials.  For all these reasons, Plaintiffs are unable to establish a likelihood of success

on the merits of their VRA claim.

## II.     PLAINTIFFS CANNOT DEMONSTRATE IRREPARABLE HARM

Plaintiffs' motion for emergency relief also must be denied because they have not met their

burden to show that they are likely to suffer irreparable harm in the absence of an injunction.

*Winter*, 555 U.S. at 21-22.  To satisfy the "high standard" for establishing irreparable harm, Plaintiffs

must show that their asserted injuries are (1) "certain" and "great," not "theoretical," and (2) "of

such *imminence* that there is a 'clear and present' need" for relief to prevent harm that would

otherwise be "beyond remediation."  *Chaplaincy of Full Gospel Churches v. England*, 454 F.3d 290, 297

(D.C. Cir. 2006); *CityFed Fin. Corp.*, 58 F.3d at 747.

Yet as already discussed, Plaintiffs have not adduced sufficient evidence of real and

immediate threats of injury even to meet the requirements of Article III standing.  The fears

expressed by Plaintiffs Schwartz and Lopez—that law enforcement officers or supporters of the

President will threaten and intimidate them at the polls, that they may be "investigated" if they mail

---

[14] The Justice Department's definitive legal guidance concerning Section 592 confirms that "Section 592 prohibits the use of official authority to order armed personnel to the polls," and the "effect of this statute is to prohibit FBI Special Agents from conducting investigations within the polls on election day, and Deputy U.S. Marshals from being stationed at open polls, as both are required to carry their weapons while on duty."  U.S. Dep't of Justice, *Federal Prosecution of Election Offenses* 73, 85-86 (8th ed. 2017), https://www.justice.gov/criminal/file/1029066/download.

in their ballots, and that their ballots might not arrive in time or be counted—are all conjectural in nature, and lack evidentiary support. *See supra* at 12-17.   Plaintiff MFV has adduced no evidence that the alleged conduct of Defendants is impairing its ability to conduct its operations, or that it has incurred operational costs to counteract Defendants' conduct in excess of those ordinarily expended to pursue its goals. *Supra* at 18-21.   It follows *a fortiori* from Plaintiffs' failure to establish a sufficiently certain threat of injury to establish standing that they have also failed to show "a clear and present need for equitable relief to prevent irreparable harm." *Chaplaincy of Full Gospel Churches*, 454 F.3d at 297.   This deficiency also requires that Plaintiffs' motion be denied.

## III.   THE BALANCE OF THE EQUITIES DOES NOT JUSTIFY RELIEF

An injunction also is not appropriate because the balance of the equities and the public interest tip sharply in Defendants' favor.   First, given that Plaintiffs cannot establish the first two factors necessary to establish entitlement to an injunction, "it is clear they cannot make the corresponding strong showings [on the second two factors] required to tip the balance in their favor." *Davis v. Pension Ben. Guar. Corp.*, 571 F.3d 1288, 1295 (D.C. Cir. 2009); *GEO Specialty Chemicals, Inc. v. Husisian*, 923 F. Supp. 2d 143, 151 (D.D.C. 2013) (Leon, J.) ("Having failed to find that irreparable injury would result from a denial of [plaintiff's] motion, the Court need not reach the other factors necessary to warrant injunctive relief.").

Second, although there is no dispute that protecting the right to vote is in the public interest, Plaintiffs acknowledge that they are seeking a disfavored "follow-the-law" injunction, which is contrary to the public interest.   Pls.' Mem. at 39 ("Much of the conduct Plaintiffs seek to enjoin is already prohibited by federal statute, including but not limited to, the VRA that grounds this motion and the relief requested.").   This Court has held that follow-the-law injunctions are not in the public interest where, as here, there had been "no abdication of statutory authority" by the agency. *Hunter*

*v. FERC*, 527 F. Supp. 2d 9, 18 (D.D.C. 2007) (Leon, J.).  *See also Waite v. Macy*, 246 U.S. 606, 609

(1918) ("Courts will not issue injunctions against administrative officers on the mere apprehension

that they will not do their duty or will not follow the law."); *Davidson v. Loudon Cty. Bd. of Supervisors*,

267 F. Supp. 3d 702, 722 (E.D. Va. 2017) (holding that "injunctions that simply require their

subjects to follow the law are generally overbroad.") (citations omitted).

    The proposed injunction, if granted, would also infringe on critical First Amendment

interests.  For example, Plaintiffs seek to enjoin the President from "using official White House

public communication channels, including the @realDonaldTrump Twitter account, to make

statements or suggest that lawful votes will be subject to heightened scrutiny by election officials;

that people who lawfully vote by mail will have their ballots or their voting eligibility scrutinized by

election officials; that lawful mail-in votes will not be counted; or that lawful mail-in ballots will be

challenged."  Pls.' Proposed Order ¶ 6.  Thus, Plaintiffs' proposed injunction appears intended to

act as a prior restraint on the political speech of a candidate in the midst of an election campaign,

speech entitled to the "fullest and most urgent" protection of the First Amendment.  *Citizens United*,

558 U.S. at 339; *see also Barnes v. Small*, 840 F.2d 972, 982 (D.C. Cir. 1987); *Nordstrom, Inc. v. PARAN*,

No. 92-1349, 1992 WL 172573, *1 (D.D.C. Jun. 29, 1992).

    Plaintiffs also seek to regulate by injunction the purposes for and the locations at which

Defendants may deploy federal law enforcement personnel during the election.  Pls.' Proposed

Order ¶¶ 2-4.  But "[i]t is not for [a court] to impose its preferred police practices on either federal

law enforcement officials or their state counterparts," *United States v. Patane*, 542 U.S. 630, 642

(2004), or to hamstring the Government's ability to appropriately deploy federal law enforcement

officials on or around election day should doing so become necessary in the interests of public

safety.  Courts must "respect[ ] . . . the interest of the community in maintaining peace and order on

its streets." *Feiner v. New York*, 340 U.S. 315, 320 (1951).

Accordingly, if the Court reaches the balance of the equities and the public interest, it should conclude that those factors weigh heavily against granting the relief Plaintiffs seek.

## IV.     THE INJUNCTIVE RELIEF PLAINTIFFS SEEK IS IMPROPER

Plaintiffs' proposed injunction is not only contrary to the public interest, it is barred in most respects by the separation of powers and the Federal Rules of Civil Procedure.

### A.   Plaintiffs Cannot Obtain Equitable Relief Against the President in his Official Capacity

Plaintiffs' broad and amorphous request for injunctive and declaratory relief directed to the President is contrary to law.  As the Supreme Court and the D.C. Circuit have recognized, a court may not issue a declaratory judgment or an injunction against the President in his official capacity and in the performance of his discretionary actions.  To maintain the constitutional separation of powers, courts have long recognized that the non-ministerial conduct of the President when he acts in his official capacity cannot be enjoined.  In *Mississippi v. Johnson*, the Supreme Court held that it had "no jurisdiction of a bill to enjoin the President in the performance of his official duties."  71 U.S. 475, 501 (1866).  In that case, the State of Mississippi sought to enjoin President Andrew Johnson from executing the Reconstruction Acts, which Mississippi claimed were unconstitutional. *Id.* at 497.  In barring injunctive relief against the President, the Court reasoned that when the presidential action requires "the exercise of judgment," "general principles . . . forbid judicial interference with the exercise of Executive discretion."  *Id.* at 499.  Just as courts cannot enjoin Congress in exercising its legislative function, they cannot enjoin the President in exercising the executive function.  *Id.* at 500 ("Neither can be restrained in its action by the judicial department[.]"). To do so, the Court observed, would be "without a precedent."  *Id.*

A "majority of the Justices" in *Franklin v. Massachusetts*, 505 U.S. 788 (1992), reaffirmed these fundamental principles.  *Swann v. Clinton*, 100 F.3d 973, 977 (D.C. Cir. 1996).  In *Franklin*, a district court issued an injunction requiring the President to take certain actions related to the census.  *See*

505 U.S. at 791.  Writing for a four-Justice plurality, Justice O'Connor explained that "the District Court's grant of injunctive relief against the President himself [was] extraordinary, and should have raised judicial eyebrows."  *Id.* at 802.  The plurality reiterated that "in general, '[the] court has no jurisdiction of a bill to enjoin the President in the performance of his official duties.'"  *Id.* at 802-03 (citation omitted) (quoting *Mississippi*, 71 U.S. at 501).  "At the threshold," it said, "the District Court should have evaluated whether injunctive relief against the President was available, and if not, whether appellees' injuries were nonetheless redressable."  *Id.* at 803.

Concurring in *Franklin*, Justice Scalia explained that, under *Mississippi*, courts may impose neither injunctive nor declaratory relief against the President in his official capacity.  *Id.* at 827-28.  Therefore, just as the President is absolutely immune from official capacity damages suits, so too is he immune from efforts to enjoin him in his official capacity.  *Id.* at 827 ("Many of the reasons [the Court] gave in *Nixon v. Fitzgerald*, [457 U.S. 731, 749 (1982)], for acknowledging an absolute Presidential immunity from civil damages for official acts apply with equal, if not greater, force to requests for declaratory or injunctive relief in official-capacity suits that challenge the President's performance of executive functions.").  Justice Scalia reasoned that the principle that the President "may not be ordered to perform particular executive . . . acts at the behest of the Judiciary" is "implicit in the separation of powers" and is supported by Supreme Court precedent.  *Id.* at 827-28.  "Permitting declaratory or injunctive relief against the President personally would not only distract him from his constitutional responsibility to 'take Care that the Laws be faithfully executed,'" but also "would produce needless head-on confrontations between district judges and the chief executive."  *Id.* at 828 (quoting U.S. Const., Art. II, § 3).  Based on these separation-of-powers concerns, Justice Scalia concluded that "[u]nless the other branches are to be entirely subordinated to the Judiciary, [the courts] cannot direct the President to take a specified executive act."  *Id.* at 829.

In line with *Mississippi* and *Franklin*, courts in this and other circuits have rejected litigants' demands to enjoin the President in the performance of his official duties, regardless of the claim.[15] For example, in *Swan v. Clinton*, a former member of the National Credit Union Administration ("NCUA") Board sued the President and two subordinates after the President removed him from his position.  100 F.3d at 975.  The plaintiff sought to have his removal and his successor's appointment declared unlawful and to obtain injunctive relief ordering his reinstatement as a member of the NCUA Board.  *Id.*  In determining whether the plaintiff's injury was redressable, the D.C. Circuit considered "whether a federal court has the power to grant injunctive relief against the President of the United States in the exercise of his official duties."  *Id.* at 976.  The Court first recognized that the Supreme Court in *Franklin* had "'left open the question whether the President might be subject to a judicial injunction requiring the performance of a purely 'ministerial' duty.'"  *Id.* at 977 (quoting *Franklin*, 505 U.S. at 802).[16]  Although the Court found the President's duty to

---

[15] *See, e.g., Hawaii v. Trump*, 859 F.3d 741, 788 (9th Cir.), *vacated and remanded on other grounds*, 138 S. Ct. 377, 199 L. Ed. 2d 275 (2017), *Int'l Refugee Assistance Project v. Trump*, 857 F.3d 557, 605 (4th Cir.), *vacated and remanded on other grounds sub. nom. Trump v. Int'l Refugee Assistance*, 138 S. Ct. 353 (2017); *Int'l Refugee Assistance Project v. Trump*, 265 F. Supp. 3d 570, 632 (D. Md. 2017); *Cty. of Santa Clara v. Trump*, 250 F. Supp. 3d 497, 539–40 (N.D. Cal. 2017), *appeal docketed* No. 17-16886 (9th Cir. Sept. 18, 2017); *Settle v. Obama*, No. 3:15-cv-365, 2015 WL 7283105, at *6 (E.D. Tenn. Nov. 17, 2015); *Day v. Obama*, No. 1:15-cv-00671, 2015 WL 2122289, at *1 (D.D.C. May 1, 2015); *Willis v. HHS*, 38 F. Supp. 3d 1274, 1277 (W.D. Okla. 2014); *McMeans v. Obama*, No. 11-cv- 891, 2011 WL 6046634, at *3 (D. Del. Dec. 1, 2011); *Shreeve v. Obama*, No. 1:10-cv-71, 2010 WL 4628177, at *5 (E.D. Tenn. Nov. 4, 2010); *Anderson v. Obama*, No. CIV. PJM 10-17, 2010 WL 3000765, at *2 (D. Md. July 28, 2010); *Carlson v. Bush*, No. 6:07CV1129-ORL19UAM, 2007 WL 3047138, at *3 (M.D. Fla. Oct. 18, 2007); *Comm. to Establish the Gold Standard v. United States*, 392 F. Supp. 504, 506 (S.D.N.Y. 1975); *Nat'l Ass'n of Internal Revenue Emps. v. Nixon*, 349 F. Supp. 18, 21–22 (D.D.C. 1972); *Reese v. Nixon*, 347 F. Supp. 314, 316–17 (C.D. Cal. 1972); *S.F. Redevelopment Agency v. Nixon*, 329 F. Supp. 672, 672 (N.D. Cal. 1971); *Suskin v. Nixon*, 304 F. Supp. 71, 72 (N.D. Ill. 1969). Plaintiffs' reliance on *Int'l Refugee Assistance Project v. Trump*, 857 F.3d 554, 587 (4th Cir. 2017), Pls.' Mem. at 44, n.71, is particularly puzzling, as the Fourth Circuit expressly found that "the district court erred in issuing an injunction against the President himself," and lifted the injunction as to the President.  *Int'l Refugee Assistance Project*, 857 F.3d at 605-06.

[16] A ministerial duty is "a simple, definite duty" that is "imposed by law" where "nothing is left to discretion."  *Mississippi*, 71 U.S. at 498; *see also Swan*, 100 F.3d at 977 ("A ministerial duty is one that

comply with the removal restrictions in the NCUA statute was "ministerial and not discretionary," it nonetheless determined that injunctive relief against the President was not appropriate. *Id.* The Court reiterated the Supreme Court's "stern admonition" from *Franklin* that "injunctive relief against the President personally is an extraordinary measure not lightly to be undertaken." *Id.* at 978. The rationale behind this doctrine, the Court found, was "painfully obvious":

> The President, like Congress, is a coequal branch of government, and for the President to 'be ordered to perform particular executive . . . acts at the behest of the Judiciary,' at best creates an unseemly appearance of constitutional tension and at worst risks a violation of the constitutional separation of powers.

*Id.* (quoting *Franklin*, 505 U.S. at 827 (Scalia, J., concurring in part and concurring in the judgment).

The district court expressed similar concerns regarding the separation of powers in *Newdow v. Bush*, 355 F. Supp. 2d 265 (D.D.C. 2005). In that case, the plaintiff moved for a preliminary injunction against all defendants, including the President, to prevent the use of clergymen to engage in any religious act at the presidential inauguration. *Id.* at 270–71. Although the plaintiff argued that the Court should "read an exception into the immunity of the President from injunctive relief for instances where he is claimed to have violated the Constitution," the Court found that "there is no support at all for such an exception." *Id.* at 282. Noting that it would be an "extraordinary measure" to issue an injunction against the President— even for alleged Constitutional violations— the Court stated that it was "not aware of any" cases where "an injunction against the President

---

admits of no discretion, so that the official in question has no authority to determine whether to perform the duty." (citing *Mississippi*, 71 U.S. at 498)). In contrast, "a duty is discretionary if it involves judgment, planning, or policy decisions." *Beatty v. Washington Metro. Area Transit Auth.*, 860 F.2d 1117, 1127 (D.C. Cir. 1988) (citation omitted). There can be no question here that Plaintiffs seek to enjoin the President from performing a discretionary duty concerning matters related to the election. But even if the duty were somehow seen as ministerial, injunctive relief would still be improper. *See Swan*, 100 F.3d at 977-78; *Lovitky v. Trump*, No. 19-1454, 2019 WL 3068344, at *10 (D.D.C. July 12, 2019) (Kollar-Kotelly, J.) ("This Court should not grant mandamus, injunctive, or declaratory relief against a sitting President to require performance of a ministerial duty."), *aff'd in part, vacated in part on other grounds*, 949 F.3d 753 (D.C. Cir. 2020).

[was] issued and sustained by the federal courts." *Id.* Given its "grave concerns about its power to issue an injunction against the President," the Court denied the plaintiff's motion. *Id.*

In a similar case challenging prayers at a subsequent presidential inauguration, the D.C. Circuit affirmed the dismissal of the plaintiff's case, finding that "[t]he only apparent avenue of redress for plaintiffs' claims would be injunctive or declaratory relief" against the President, but "such relief is unavailable." *Newdow v. Roberts*, 603 F.3d 1002, 1013 (D.C. Cir. 2010). The Court concluded that "[w]ith regard to the President, courts do not have jurisdiction to enjoin him and have never submitted the President to declaratory relief."[17] *Id.* (citing *Mississippi*, 71 U.S. at 501; *Franklin*, 505 U.S. at 827–29).

Plaintiffs' brief does not discuss these cases, much less explain why they are not controlling here.[18] Indeed, perhaps in implicit recognition that Plaintiffs may not seek injunctive relief against the President under these circumstances, they alternatively request a declaration against the President. Pls.' Mem. at 44. Plaintiffs' alternative request fares no better. With respect to Executive Branch officials, a "declaratory judgment is the functional equivalent of an injunction." *Comm. on the Judiciary of the U.S. House of Representatives v. Miers*, 542 F.3d 909, 911 (D.C. Cir. 2008)

---

[17] This is not to say that Plaintiffs may not bring their claims against the other Defendants in this case or that the Court may not enjoin the actions of subordinate officials in the Executive Branch. To the contrary, "[i]n most cases, any conflict between the desire to avoid confronting the elected head of a coequal branch of government and to ensure the rule of law can be successfully bypassed, because the injury at issue can be rectified by injunctive relief against subordinate officials." *Swan*, 100 F.3d at 978–79 (citing *Franklin*, 505 U.S. at 803; *Chamber of Commerce v. Reich*, 74 F.3d 1322, 1331 n.4 (D.C. Cir. 1996); *Harlow v. Fitzgerald*, 457 U.S. 800, 811 n.17 (1982)). Thus, in cases involving the President and other defendants, courts avoid granting relief against the President and instead grant relief only against subordinate officials in the Executive Branch. *See, e.g.*, *id.* at 976–80.

[18] Plaintiffs cite inapposite cases that do not address the issue of whether the President may be subject to equitable relief for official, non-ministerial acts. For example, Plaintiffs rely upon *Clinton v. Jones*, 520 U.S. 681, 703 (1997), for the unremarkable proposition that "[t]he Court has the authority to determine whether [the President] has acted within the law." Pls.' Mem at 43. But *Clinton* did not involve presidential conduct, let alone injunctive relief directed to the president for non-ministerial acts in his official capacity. Rather, *Clinton* involved allegations of sexual harassment that occurred before the president took office. 520 U.S. at 684.

(citing *Sanchez-Espinoza v. Regan*, 770 F.2d 202, 208 n.8 (D.C. Cir. 1985)), because "it must be presumed that federal officials will adhere to the law as declared by the court," *Sanchez-Espiniza*, 770 F.2d at 208 n.8, with respect to the parties before it.  Therefore, "similar considerations regarding a court's power to issue [injunctive] relief against the President himself apply to [a] request for a declaratory judgment.  *Swann*, 100 F.3d at 976 n.1; *see also Sanchez-Espinoza*, 770 F.2d at 208 n.8 (The "equivalence of [the] effect" of injunctive and declaratory relief directed at Executive Branch officials "dictates an equivalence of criteria for issuance." (citing *Samuels v. Mackell*, 401 U.S. 66, 73 (1971)).  As Justice Scalia explained in *Franklin*:

> For similar reasons, I think we cannot issue a declaratory judgment against the President.  It is incompatible with his constitutional position that he can be compelled personally to defend his executive actions before a court . . . .  The President's immunity from such judicial relief is "a functionally mandated incident of the President's unique office, rooted in the constitutional tradition of the separation of powers and supported by our history."

505 U.S. at 827-28 (Scalia, J., concurring) (quoting *Nixon v. Fitzgerald*, 457 U.S. 731, 749 (1982)).  Following *Franklin*, the D.C. Circuit determined that "declaratory relief" against the President for his non-ministerial conduct "is unavailable."  *Newdow v. Roberts*, 603 F.3d 1002, 1012-13 (D.C. Cir. 2010) ("The only apparent avenue of redress for plaintiffs' claimed injuries would be injunctive or declaratory relief against all possible President-elects and the President himself.  But such relief is unavailable.").  The district court likewise found that "the same principles foreclose a declaratory judgment against the President as well as injunctive relief."  *Newdow*, 355 F. Supp. 2d at 281 (citing *Swan*, 100 F.3d at 977).  Accordingly, Plaintiffs' alternative request for declaratory relief against the President in connection with his official, non-ministerial actions should be rejected.

The *Mississippi v. Johnson* line of cases underscores that the President is not a proper defendant in this case, and that he may not properly be subject to injunctive or declaratory relief for non-ministerial acts taken in his official capacity.  It is undisputed that Plaintiffs have brought suit against the President in part in his official capacity.  Compl. ¶ 11 ("Defendant

Donald J. Trump is the current president of the United States and an individual candidate for public office.  He is sued in his individual and official capacities.").  It also is undisputed that Plaintiffs seek declaratory and injunctive relief against the President, and that Plaintiffs' proposed injunction relates to discretionary, non-ministerial actions.  *See generally* Pls.' Proposed Order.  It is further undisputed that Plaintiffs also have brought suit against the Attorney General and the Acting Secretary of Homeland Security, Compl. ¶¶ 13-14, and is seeking to enjoin their conduct along with the President's.  Pls.' Proposed Order ¶¶ 2-5.  Nor is it disputed that Plaintiffs could obtain partial relief for their alleged injuries through injunctive relief against those Defendants.  Accordingly, because this Court cannot issue a declaratory judgment or an order enjoining the President for his official, discretionary action, the Court should deny Plaintiffs' motion for temporary or preliminary injunctive relief against the President.

### B.    Plaintiffs' Proposed Injunction Fails to Comply with Federal Rule of Civil Procedure 65

Federal Rule of Civil Procedure 65(d)(1) requires that "[e]very order granting an injunction" must "state its terms specifically," and "describe in reasonable detail—and not by reference to the complaint or other document—the act or acts restrained or required."  As the Supreme Court has explained:

> The specificity provisions of Rule 65(d) are no mere technical requirements. The Rule was designed to prevent uncertainty and confusion on the part of those faced with injunctive orders, and to avoid the possible founding of a contempt citation on a decree too vague to be understood.  Since an injunctive order prohibits conduct under threat of judicial punishment, basic fairness requires that those enjoined receive explicit notice of precisely what conduct is outlawed.

*Schmidt v. Lessard*, 414 U.S. 473, 476 (1974) (footnotes and citations omitted); *Atiyeh v. Capps*, 101 S. Ct. 829, 832 (1981) (Rehnquist, C.J.) (holding that an injunction requiring prison officials to accomplish a further reduction of the inmate population at three facilities by "at least 250" individuals by a date certain "falls short of [Rule 65's] specificity requirement."); *Common Cause v.*

*Nuclear Regulatory Comm'n*, 674 F.2d 921, 926-27 (D.C. Cir. 1982) (holding that an injunction barring

the NRC from closing to the public future meetings of "a similar nature" lacked the requisite

specificity under Rule 65).  The D.C. Circuit has held "injunctions to be too vague when they enjoin

all violations of a statute in the abstract without further specification, or when they include, as a

necessary descriptor of the forbidden conduct, an undefined term that the circumstances of the case

do not clarify."  *United States v. Phillip Morris USA Inc.*, 566 F.3d 1095, 1137 (D.C. Cir. 2009).

Plaintiffs' requested injunction falls far short of the requirements of Rule 65(d).  For

example, Plaintiffs' proposed injunction seeks to enjoin the President from "encouraging, urging,

and/or importuning his supporters, to bring weapons to polling places, to question or otherwise

intimidate voters, or to otherwise interfere with voting and ballot counting."  Pls.' Proposed Order,

¶ 1.  Plaintiffs do not explain what specific conduct or actions they seek to enjoin the President from

taking, and instead refer to amorphous concepts such as "encouraging," "urging," "otherwise

intimidate voters," and "otherwise interfere with voting and ballot counting," without any

explanation of what such "encouraging," "urging," and "interference" encompasses.  Such

undefined concepts fail to put the Defendants on reasonable notice and improperly place them at

risk of contempt based on an ambiguously worded injunction.

Plaintiffs' proposed injunction also seeks to enjoin Defendants from "deploying federal law

enforcement agents at, or within 300 feet of, polling places for the purpose of questioning voters

about their credentials; impeding or delaying voters by asking for identification; videotaping,

photographing, or otherwise making visual records of voters or their vehicles; or informing voters

that voter fraud is a crime and/or recounting the penalties under any state or federal statute for

impermissibly casting a ballot."  Pls.' Proposed Order, ¶ 2.  This provision is overbroad, as it sweeps

in legitimate law enforcement activity.  For example, as written this provision could preclude the

United States Secret Service from responding to threatening behavior directed towards a protectee who goes to a polling location.

Similarly, Plaintiffs' proposed injunction seeks to enjoin all of the Defendants from "deploying armed federal law enforcement agents at, or within 300 feet of, polling places while voting and ballot counting is underway except where necessary, as demonstrated by specific evidence pertaining to a particular polling place, to repel armed enemies of the United States." Pls.' Proposed Order, ¶ 3. To the extent Plaintiffs proposed injunction tracks the language of 18 U.S.C. § 592, it is an improper follow-the-law injunction. *See supra*, at 31. And where it seeks to add additional requirements, such as the "specific evidence" necessary to justify deployment of armed federal law enforcement agents at polling places, it is vague and undefined. It also is overbroad and sweeps in legitimate law enforcement activity for the same reason as discussed above.

Plaintiffs' proposed injunction also seeks to enjoin the Defendants from "ordering federal agents and employees to block the delivery of ballots or interfere in the counting of ballots." Pls.' Proposed Order, ¶ 4. But the proposed injunction fails to define what is meant by "block[ing]" or "interfer[ing]" with the counting of ballots, leaving them without any clear understanding of the conduct purportedly covered by this provision.

Plaintiffs further seek to enjoin the Defendants "from taking any actions that may limit the speed or reliability of mail delivery between now and November 10, 2020." Pls.' Proposed Order, ¶ 5. Beyond the fact that this proposed injunction bears no relation to voter intimidation, as discussed *supra*, Pls.' Mem. at 14, n.6, the USPS already is subject to multiple injunctions to ensure the timely delivery and handling of election mail, and Plaintiffs fail to explain why another injunction would serve any useful purpose here.

Finally, Plaintiffs seek to enjoin the President from "using official White House public communication channels, including the @realDonaldTrump Twitter account, to make statements or suggest that lawful votes will be subject to heightened scrutiny by election officials; that people who lawfully vote by mail will have their ballots or their voting eligibility scrutinized by election officials; that lawful mail-in votes will not be counted; or that lawful mail-in ballots will be challenged."  Pls.' Proposed Order, ¶ 6.  Even putting aside the critical First Amendment concerns discussed above, this aspect of the proposed injunction lacks the requisite specificity under Rule 65.  It does not define "official White House public communication channels" and is not even limited to "statements," but to "suggest[ions]."  Furthermore, it prohibits the President from stating or implying that "lawful mail-in ballots will be challenged."  But the injunction fails to explain what is meant by "lawful" mail-in ballots.  For example, there is nothing inherently improper about challenging either the handling or tabulation of mail-in ballots.  Indeed, under the plain language of the proposed injunction, it is unclear whether, even if the final vote is close enough to trigger an automatic recount in a particular State, the President could make any statement challenging the validity of questionable mail-in ballots.

In short, Plaintiffs' proposed injunction lacks the requisite specificity under Rule 65, and for that reason alone Plaintiffs' requested motion for a temporary restraining order and preliminary injunction should be denied.

## V.      PLAINTIFFS' REQUEST FOR A SPEEDY HEARING UNDER RULE 57 SHOULD BE DENIED

Plaintiffs contend that they are entitled to speedy resolution of their declaratory judgment claim concerning alleged VRA violations even though Defendants have not yet responded to Plaintiffs' complaint; the claims raised by Plaintiffs are profoundly intertwined with the facts and circumstances of scores of statements and actions by Defendants alleged in the Complaint; and

Plaintiffs have sought both a temporary restraining order and a preliminary injunction.  Pls.' Mem. at 41-42.  Plaintiffs' request should be denied.

      As an initial matter, Plaintiffs' request for a speedy hearing under Rule 57 is premature because Defendants have not yet filed a responsive pleading in this case.  *Perry*, No. 1:17-cv-586, 2017 WL 11519168, *3 ("Implicit in Rule 57, however, is the assumption that prior to any such order, 'the matter in issue will have been joined by the filing of a responsive pleading.'") (citation omitted); *Gardner*, No. 1:20-cv-00240, 2020 WL 4808686, *1 (holding that Rule 57 motion was premature because "Defendants have not yet filed an answer and the time to do so has not yet expired.").  Plaintiffs served their complaint on October 22, 2020.  Pursuant to Federal Rule of Civil Procedure 12(a), Defendants' responsive pleading is not due until December 22, 2020.  Accordingly, Plaintiffs' request for a speeding hearing under Rule 57 is premature.

      More fundamentally, a speedy hearing under Rule 57 is inappropriate because the questions presented by Plaintiffs' Section 11(b) claim are not purely (or even largely) legal in nature, but are deeply entangled with dozens and dozens of alleged statements made and actions taken by the President, the Attorney General, and the Acting Secretary over a period of five months, and the circumstances surrounding each of them.  *GEC US 1 LLC*, No. 16-cv-1276, 2016 WL 3345456, *6 (denying motion for a speedy hearing under Rule 57 where there were contested issues of fact).  Plaintiffs nevertheless inconsistently argue that "the Court need only decide an issue of law," Pls.' Mem. at 42, and that the facts are not in dispute because their allegations "draw almost entirely from Defendants' own public statements and acts."  *Id.*  Plaintiffs are wrong on both counts.

      First, it is apparent that Plaintiffs' claim for declaratory relief concerning alleged violation of the VRA is a mixed question of fact and law.  Their proposed order makes that clear and identifies at least eight separate required factual findings:

> [1] Defendants' actions and statements concerning deploying armed federal law enforcement agents to suppress peaceful protests, [2] encouraging vigilante violence

against demonstrators, [3] discrediting voting by mail, [4] sabotaging mail delivery for the purpose of making voting mail less reliable, [5] threatening to ban voting by mail or preventing mailed-in votes from being counted, [6] threatening to send law enforcement to polling places, [7] proposing to delay the 2020 general election, and [8] stating that President Trump will refuse to recognize the legitimacy of election results if he is not declared the winner, constitute unlawful voter intimidation in violation of Section 11(b) of the Voting Rights Act.

Pls.' Proposed Order ¶ 7.

Second, Defendants dispute a number of these allegations, as well as the inferences that Plaintiffs seek to draw from them.  In short, the fact-bound nature of Plaintiffs' claim make it unsuitable for speedy resolution under Rule 57.

In a last ditch effort to justify proceeding under Rule 57, Plaintiffs contend that speedy resolution is necessary because Plaintiffs are suffering on-going irreparable harm.  Pls.' Mem. at 42-43.  Although the Defendants disagree that Plaintiffs are suffering any such harm, that concern adequately can be addressed through the resolution of Plaintiffs' requests for a temporary restraining order and preliminary injunction.  Plaintiffs' request for speedy resolution of their request for declaratory relief under Rule 57 should be denied.

## CONCLUSION

For the aforementioned reasons, this Court should deny Plaintiffs' motion for a temporary restraining order, permanent injunction, and speedy declaratory judgment.

Dated:  October 26, 2020

Respectfully submitted,

JEFFREY BOSSERT CLARK
Acting Assistant Attorney General

JAMES J. GILLIGAN
Special Litigation Counsel

JOHN V. COGHLAN
Deputy Assistant Attorney General

*/s/ Joshua E. Gardner*
JOSHUA E. GARDNER
Special Counsel

ALEXANDER K. HAAS
Director

STEPHEN M. ELLIOTT
Special Counsel

45

U.S. Department of Justice
Civil Division, Federal Programs Branch
1100 L Street, NW
Washington, DC  20005
Tel:  (202) 305-7583
Fax:  (202) 616-8470
E-mail:  Joshua.E.Gardner@usdoj.gov

*Counsel for Defendants*