IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| MI FAMILIA VOTA EDUCATION FUND; SARA SCHWARTZ; and MARLA LOPEZ, <br><br> Plaintiffs, <br><br> -against- <br><br> DONALD J. TRUMP, in his individual and official capacity as President of the United States; WILLIAM P. BARR, in his official capacity as Attorney General; and CHAD F. WOLF, in his official capacity as Acting Secretary of Homeland Security, <br><br> Defendants. | No. 20 Civ. 03030 <br><br> **REPLY MEMORANDUM OF LAW IN FURTHER SUPPORT OF PLAINTIFFS' MOTION FOR A TEMPORARY RESTRAINING ORDER, PRELIMINARY INJUNCTION, AND SPEEDY DECLARATORY JUDGMENT** |

<u>TABLE OF CONTENTS</u>

<u>PAGE NO.</u>

TABLE OF AUTHORITIES ................................................................................................ ii

**PRELIMINARY STATEMENT** ..................................................................................1

**ARGUMENT** ...................................................................................................................1

  I.  PLAINTIFFS ARE LIKELY TO SUCCEED ON THE MERITS OF THEIR CLAIM .........1

    A.  Defendant Trump's Threats of Violence are Credible .....................................2

    B.  Defendants' Conduct Falls Well Within the Plain Meaning of the Terms "Intimidate" and "Threaten" ...............................................................................5

    C.  The Court Has Subject-Matter Jurisdiction Over Plaintiffs' VRA Claims .....................8

        1.  There Is a Private Right of Action Under Section 11(b) of the VRA ................8

        2.  Sovereign Immunity Does Not Bar this Case ...................................................10

      3.  Plaintiffs Have Standing ........................................................................................13

        a.  Plaintiffs Schwartz and Lopez Have Standing ..................................13

        b.  Plaintiff Mi Familia Vota Education Fund Has Standing ................................17

  II.  PLAINTIFFS FACE IRREPARABLE HARM ..................................................................20

  III.  THE BALANCE OF THE EQUITIES AND THE PUBLIC INTEREST WEIGH IN FAVOR OF PLAINTIFFS' REQUESTED RELIEF ..................................................21

  IV.  PLAINTIFFS ARE ENTITLED TO EQUITABLE RELIEF AGAINST THE PRESIDENT ..........................................................................................................22

  V.  PLAINTIFFS ARE ENTITLED TO EXPEDITED DECLARATORY RELIEF ............24

**CONCLUSION** .............................................................................................................25

TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Allen v. State Bd. of Elec.*,
   393 U.S. 544 (1969) ................................................................................................8

*Am. Ins. Ass'n v. U.S. Dep't of Housing & Urban Dev.*,
   74 F. Supp. 3d 30 (D.D.C. 2014), *vacated and remanded*, No. 14-5321 (Sept.
   23, 2015) ................................................................................................13

*Ariz. Dem. Party v. Ariz. Rep. Party*,
   No. 16 Civ. 03752, 2016 WL 8669978 (D. Ariz. Nov. 4, 2016) ...........................................10

*Baker v. Carr*,
   369 U.S. 186 (1962) ................................................................................................23

*Bivens v. Six Unknown Named Agents*,
   403 U.S. 388 (1971) ................................................................................................8

*Bostock v. Clayton Cnty., Ga.*,
   140 S. Ct. 1731 (2020) ................................................................................................5

*Burson v. Freeman*,
   504 U.S. 191 (1992) ................................................................................................21

*Castañon v. United States*,
   444 F. Supp. 3d 118 (D.D.C. 2020) ................................................................................24

*Chamber of Com. v. Reich*,
   74 F.3d 1322 (D.C. Cir. 1996) ................................................................................11, 12

*Clapper v. Amnesty Int'l*,
   568 U.S. 398 (2013) ................................................................................................17

*Clark v. Library of Cong.*,
   750 F.2d 89 (D.C. Cir. 1984) ................................................................................11, 12

*Clinton v. Jones*,
   520 U.S. 681 (1997) ................................................................................................24

*Cohen v. United States*,
   650 F.3d 717 (D.C. Cir. 2011) ................................................................................10

*Cort v. Ash*,
   422 U.S. 66 (1975) ................................................................................................9

*Daschle v. Thune*,
   No. 4:04 Civ 04177 (D.S.D. Nov. 1, 2004) ..................................................................9

*Dem. Nat'l Comm. v. Rep. Nat'l Comm.*,
   671 F. Supp. 2d 575 (D.N.J. 2009) ............................................................................6

*Dugan v. Rank*,
   372 U.S. 609 (1963) ..................................................................................................12

*Elonis v. United States*,
   575 U.S. 723 (2015) ..................................................................................................21

*Equal Rights Ctr. v. Post Props., Inc.*,
   657 F. Supp. 2d 197 (D.D.C. 2009), *aff'd*, 633 F.3d 1136 (D.C. Cir. 2011) ............19

*Fair Emp. Council of Greater Washington, Inc. v. BMC Mktg. Corp.*,
   28 F.3d 1268 (D.C. Cir. 1994) ..................................................................................18

*Franklin v. Massachusetts*,
   505 U.S. 788 (1992) ......................................................................................23, 24, 25

*Gardner v. Newsom*,
   No. 20-cv-00240, 2020 WL 4808696 (E.D. Cal. Jul. 10, 2020) ...............................25

*Gordon v. Holder*,
   721 F.3d 638 (D.C. Cir. 2013) ..................................................................................21

*Johnson v. Interstate Mgmt. Co., LLC*,
   849 F.3d 1093 (D.C. Cir. 2017) ......................................................................8, 22, 23

*Joyner v. Browning*,
   30 F. Supp. 512 (W.D. Tenn. 1939) ............................................................................4

*Klayman v. Obama*,
   957 F. Supp. 2d 1 (D.D.C. 2013), *vacated and remanded*, 800 F.3d 559 (D.C.
   Cir. 2015) ...............................................................................................................7, 15

*Knight First Amendment Inst. at Columbia Univ. v. Trump*,
   302 F. Supp. 3d 541 (S.D.N.Y. 2018), *aff'd*, 928 F.3d 226 (2d Cir. 2019) ............24

*Lance v. Coffman*,
   549 U.S. 437 (2007) ..................................................................................................16

*Larson v. Domestic & Foreign Corp.*,
   337 U.S. 682 (1949) ..................................................................................................12

*League of Women Voters of United States v. Newby*,
   838 F.3d 1 (D.C. Cir. 2016) ...............................................................................17, 18, 20, 21

*Louisiana v. McAdoo*,
    234 U.S. 627 (1914) ............................................................................................23

*Match-E-Be-Nash-She-Wish Band of Pottawatomi Indians v. Patchak*,
    567 U.S. 209 (2012) ............................................................................................11

*MedImmune, Inc. v. Genentech, Inc.*,
    549 U.S. 118 (2007) ............................................................................................16

*Merrill Lynch, Pierce, Fenner & Smith, Inc. v. Curran*,
    456 U.S. 353 (1982) ..............................................................................................9

*Mills v. District of Columbia*,
    571 F.3d 1304 (D.C. Cir. 2009) ..........................................................................20

*Mississippi v. Johnson*,
    71 U.S. (4 Wall.) 475 (1867) ..............................................................................22

*Morse v. Rep. Party of Va.*,
    517 U.S. 186 (1996) ..............................................................................................8

*Newdow v. Bush*,
    355 F. Supp. 2d 265 (D.D.C. 2005) ....................................................................23

*Newdow v. Roberts*,
    603 F.3d 1002 (D.C. Cir. 2010) ..........................................................................23

*Nixon v. Fitzgerald*,
    457 U.S. 731 (1982) ............................................................................................23

*Ohio Dem. Party v. Donald J. Trump for President, Inc.*,
    No. 16 Civ. 4268, 2016 WL 6608962 (6th Cir. 2016) ........................................10

*Ohio v. Wyandotte Chems. Corp.*,
    401 U.S. 493 (1971) ............................................................................................22

*Olagues v. Russoniello*,
    797 F.2d 1511 (9th Cir. 1986), *vacated as moot*, 484 U.S. 806 (1987) ...................9

*Paynes v. Lee*,
    377 F.2d 61 (5th Cir. 1967) ............................................................................4, 21

*Perkins v. Matthews*,
    400 U.S. 379 (1971) ..............................................................................................8

*Perry Cap. LLC v. Mnuchin*,
    864 F.3d 591 (D.C. Cir. 2017) ............................................................................11

*Perry v. Correct Care Solutions, LLC*,
  No. 17 Civ. 586, 2017 WL 11519168 (E.D. Va. Jun. 2, 2017) ..............................................25

*Purcell v. Gonzalez*,
  549 U.S. 1 (2006) ..................................................................................................................21

*Quaid v. Kerry*,
  161 F. Supp. 3d 70 (D.D.C. 2016) .................................................................................10, 11

*R.J. Reynolds Tobacco Co. v. U.S. Food & Drug Admin.*,
  823 F. Supp. 2d 36 (D.D.C. 2011) .........................................................................................20

*Rezaian v. Islamic Republic of Iran*,
  422 F. Supp. 3d 164 (D.D.C. 2019) .........................................................................................3

*Schwier v. Cox*,
  340 F.3d 1284 (11th Cir. 2003) ...............................................................................................9

*Seila Law LLC v. Consumer Fin. Prot. Bureau*,
  140 S. Ct. 2183 (2020) .............................................................................................................6

*Shays v. Fed. Election Comm'n*,
  414 F.3d 76 (D.C. Cir. 2005) ...........................................................................................14, 15

*Shelby Cnty., Ala. v. Holder*,
  570 U.S. 529 (2013) ..................................................................................................................8

*South Carolina v. United States*,
  898 F. Supp. 2d 30 (D.D.C. 2012) ...........................................................................................8

*Spann v. Colonial Vill., Inc.*,
  899 F.2d 24 (D.C. Cir. 1990) ..................................................................................................19

*Spokeo, Inc. v. Robins*,
  136 S. Ct. 1540 (2016), ....................................................................................................15, 16

*Susan B. Anthony List v. Driehaus*,
  573 U.S. 149 (2014) .........................................................................................................13, 16

*Swan v. Clinton*,
  100 F.3d 973 (D.C. Cir. 1996) ...........................................................................................12, 23

*Trump v. Hawaii*,
  138 S. Ct. 2392 (2018) .............................................................................................................6

*Trump v. Vance*,
  140 S. Ct. 2412 (2020) ...........................................................................................................24

v

*United States v. Borges,*
    153 F. Supp. 3d 216 (D.D.C. 2015) ......................................................................3

*United States v. Bormes,*
    568 U.S. 6 (2012) .......................................................................................11, 12

*United States v. Clark,*
    249 F. Supp. 720 (S.D. Ala. 1965)......................................................................16

*United States v. McLeod,*
    385 F.2d 734 (5th Cir. 1967) ...............................................................................7

*United States v. Nixon,*
    418 U.S. 683 (1974).............................................................................................22

*United States v. Original Knights of Ku Klux Klan,*
    250 F. Supp. 330 (E.D. La. 1965) .......................................................................6

*Utah v. Evans,*
    536 U.S. 452 (2002)......................................................................................24, 25

*Valley Forge Christian Coll. v. Americans United for Separation of Church &*
    *State, Inc.,*
    454 U.S. 464 (1982).............................................................................................16

*Virginia v. Black,*
    538 U.S. 343 (2003).............................................................................................2

*Willingham v. Cnty. of Albany,*
    593 F. Supp. 2d 446 (N.D.N.Y. 2006).................................................................10

*Youngstown Sheet & Tube Co. v. Sawyer,*
    343 U.S. 579 (1952)............................................................................................6

*Ziglar v. Abbasi,*
    137 S. Ct. 1843 (2017).........................................................................................8

**Statutes**

5 U.S.C. § 702............................................................................................10, 11, 12

18 U.S.C. § 592.........................................................................................................4, 5

42 U.S.C. § 1983......................................................................................................13

52 U.S.C. § 10101(b) ...............................................................................................9

52 U.S.C. § 10307(b) ..................................................................................................12, 13

Civil Rights Act of 1957 ................................................................................................5, 9

Fair Credit Reporting Act ................................................................................................11

Voting Rights Act .................................................................................................. *passim*


## Other Authorities

Dep't of Justice, *Federal Prosecution of Election Offenses*, May 2007,
     https://www.justice.gov/sites/default/files/criminal/legacy/2013/09/30/electbo
     ok-rvs0807.pdf ........................................................................................................16

H.R. Rep. No. 89-439 (1965)............................................................................................9

*Voting Rights, Part 1: Hearings on S. 1564 Before the S. Comm. on the Judiciary*,
     89th ........................................................................................................................9

U.S. Dep't of Justice, *Federal Prosecution of Election Offenses* 54 (7th ed. rev.
     Aug. 2007), *available at*
     https://www.justice.gov/sites/default/files/criminal/legacy/2013/09/30/electbo
     ok-rvs0807.pdf ..........................................................................................................6

William Faulkner, *Requiem for a Nun* 73 (Knopf Doubleday ed. 2011).........................3

**PRELIMINARY STATEMENT**

No one disputes that the President of the United States, Attorney General, and Acting Secretary of Homeland Security have, between them, threatened to send law enforcement to polling places; encouraged violent white supremacists to "stand by"; publicly discredited, sabotaged, and threatened to block the count of votes cast by mail; and rejected the nation's unbroken 231-year history of peaceful transfers of power by refusing to commit to honor or recognize the legitimacy of the results of the presidential election. Nor is there any serious dispute that Defendants' months-long project to create a climate of fear has left many voters—in particular, Plaintiffs and those they serve—afraid that they cannot safely and reliably cast their votes. The Voting Rights Act prohibits such intimidation.

Defendants rest their defense on a series of inapplicable procedural barriers without seriously acknowledging the scope of their misconduct or the impact it has had on Plaintiffs. They claim the Voting Rights Act has nothing to say about their behavior, the President is immune from suit, his officials are immune from suit, no one has been harmed, and it is now too late to do anything. According to Defendants, this Court is powerless to restrain them from intimidating voters, or even simply declaring that Defendants have crossed a line.

But this Court is not powerless. At this pivotal moment, the Court should reject Defendants' claims to be above the law and grant Plaintiffs' motion.

**ARGUMENT**

**I.     PLAINTIFFS ARE LIKELY TO SUCCEED ON THE MERITS OF THEIR CLAIM**

Defendants' pattern and course of conduct over the past five months—most of which is undisputed and on the public record—has cumulatively created a climate of fear and

intimidation surrounding the general election at a scale seldom seen in American history and actionable under Section 11(b) of the Voting Rights Act.

### A.    Defendant Trump's Threats of Violence are Credible

The immediate factual background surrounding Defendants' actions is essential context to understanding the intimidating effect of particular statements. When Trump threatened to send "sheriffs" and "law enforcement" and "everybody" to polling places, Pl. Mem. 4-5, that statement was not made in isolation. Perhaps a recent visitor from abroad, lacking even recent historical context, would charitably interpret those words. But to understand intimidation, one must understand context. By analogy, erecting a wooden cross is not inherently frightening. Nor is lighting a wooden object aflame. Yet given this country's history, cross-burning is recognized as intimidating. *See Virginia v. Black*, 538 U.S. 343, 388 (2003) (Thomas, J., dissenting) (noting that cross-burning has "acquire[d] meaning well beyond what outsiders can comprehend").

Likewise, Trump's threat to send "sheriffs" and "law enforcement" and "everybody" to polling places cannot be examined in artificial isolation. Perhaps there is a world in which this type of threat, shorn of context, is not intimidating. But that is not the world that Defendants have spent the past five months creating. Rather, this and similar threats must be viewed in the context of the atmosphere of fear that Defendants have created with a sustained effort to demonstrate the power of the internal security apparatuses of the federal government, and (in Trump's case) the loyalty and capabilities of the non-governmental paramilitary organizations that he can activate on the streets unimpeded by ordinary command channels.

When the President of the United States threatens to send "sheriffs" and "law enforcement" and "everybody" to the polling places, many voters reasonably understand that to evoke the types of units and tactics that Trump, Barr, and Wolf field-tested on the streets of America's cities this summer. *See* Pl. Mem. 15-17. And when he instructs violent white

supremacists to "stand by" (a call that they have enthusiastically heeded, *see* Pl. Mem. 6), many voters reasonably understand that to evoke actors such as the Kenosha shooter (who Trump defended and whose actions he instructed federal officials to defend, *see* Pl. Mem. 18-19) or the Michigan assassination conspirators (whose other activity Trump had praised, *see* Pl. Mem. 19, and of whose plot he only yesterday suggested "maybe it wasn't" a problem).[1]

This context explains how voters may reasonably interpret Defendants' words and actions. Misconstruing the relevance of this background, the Government calls it "too attenuated from voting." *See* Gov. Mem. 29. But it is not at all attenuated from Defendants' threats; Section 11(b) does not require voters to compartmentalize credible threats of violence when Defendants' actions have predictably created an integrated atmosphere of fear.[2]  As the writer William Faulkner observed, "The past is never dead. It's not even past." William Faulkner, *Requiem for a Nun* 73 (Knopf Doubleday ed. 2011). The terror inflicted on many voters by Trump, Barr, Wolf, and those acting at their orders or inspiration is not so remote in time that Defendants' threats must be interpreted as if they had no history. Certainly, Plaintiffs—a Latina woman, a Jewish woman, and an organization that works with Latino voters—did not interpret them that way.

In general, intimidation or threat occurs when the intimidating or threatening statement is made, regardless of whether the threat is carried out. *See, e.g.*, *Rezaian v. Islamic Republic of Iran*, 422 F. Supp. 3d 164, 178 (D.D.C. 2019) (noting that plaintiff was "repeatedly and credibly" threatened, and "he believed that his captors might follow through on their threats" even though they never did); *United States v. Borges*, 153 F. Supp. 3d 216, 221 (D.D.C. 2015)

---

[1] On October 27, Trump told a crowd of the assassination plot, "I mean, we'll have to see if it's a problem. Right? People are entitled to say maybe it was a problem, maybe it wasn't." Maegan Vazquez & Nikki Carvajal, *Trump appears to give a pass to the domestic kidnapping plot against Whitmer*, CNN (Oct. 27, 2020), https://cnn.it/3oACASw.

[2] Furthermore, many public demonstrations that have been the site of violence ordered or supervised by Defendants (or by non-federal parties, acting at Trump's counsel) have in fact involved "urging" people to vote, which is directly protected under Section 11(b). *See* Pl. Mem. 14-15.

(holding that "the ongoing threat that the Government *may* change course at a later date" warranted relief) (emphasis in original). That is also true under Section 11(b). *See, e.g., Paynes v. Lee,* 377 F.2d 61, 63 (5th Cir. 1967) (reversing dismissal of Section 11(b) case where key allegations involved threats to "destroy or to annihilate" the plaintiff "should he again attempt to become a registered voter"). Thus, when Trump says that he will deploy "sheriffs" and "law enforcement" and "everybody" to the polls, the question for the Court is not the probability that Defendants will actually do so, but whether a voter would reasonably *fear* that they might do so. *Cf. Joyner v. Browning*, 30 F. Supp. 512, 514, 519 (W.D. Tenn. 1939) (pre-VRA case enjoining governor after he "let it be known that he *intended* to use State troops to carry out his boast of stopping the voting by local voters" because the "*threatened* use of troops . . . deprived citizens of the [constitutional] right to vote") (emphases added). And it is hardly unreasonable or "speculative," Gov. Mem. 30, for Plaintiffs to take the President of the United States at his word.

Indeed, since the filing of the Motion, Defendants have announced that they are activating armed Department of Homeland Security (DHS) components for Election Day deployment. Just a few hours before the Government filed its brief in this Court, DHS officials under Wolf's supervision informed reporters that both Immigrations and Customs Enforcement (ICE) and Customs and Border Protection (CBP) are preparing to mobilize to American cities around the time of the election, with (in the words of "Senior Official Performing the Duties of the Deputy Secretary of Homeland Security" Ken Cucinelli) "teams ready to go as needed."[3]

It is *possible* to interpret this action in the light most favorable to the Government, as a standard law enforcement response to the possibility of unrest requiring federal assistance, just as it is possible, as the Government urges, to rely on the existence of 18 U.S.C. § 592 as a

---

[3] *See* Geneva Sands & Priscilla Alvarez, *Homeland Security agencies prepare for civil unrest amid heightened tensions nationwide*, CNN (Oct. 26, 2020), https://cnn.it/3mvbSJc.

complete and effective safeguard against the deployment of armed men at or near the polls. But the evidence of the past few months refutes any such presumption of regularity. Trump and Wolf ostensibly deployed CBP troops to Portland to protect the courthouse, but once there they swept the streets, seizing and detaining suspected protesters (and in some cases passers-by) located well off federal property. *See* Pl. Mem. 16-17. Meanwhile, Section 592's prohibition on deploying armed men to polling places offers little comfort, given Trump's repeated grants and offers of clemency to soldiers, law enforcement officials, and others for following his wishes even when that means violating criminal statutes. *See* Pl. Mem. 19-20.

**B.   Defendants' Conduct Falls Well Within the Plain Meaning of the Terms "Intimidate" and "Threaten"**

The plain meaning of the terms "intimidate" and "threaten" readily encompasses Defendants' conduct here, and cannot be narrowed by claims that some speech is "abstract or rhetorical." *See* Gov. Mem. 28. The court "normally interprets a statute in accord with the ordinary public meaning of its terms at the time of its enactment." *Bostock v. Clayton Cnty., Ga.*, 140 S. Ct. 1731, 1738 (2020). The ordinary public meaning of "intimidate" and "threaten" in 1965, when the Voting Rights Act was passed, is largely the same as today: "intimidate" means "to make timid or fearful; inspire or affect with fear; frighten, especially to compel to action or inaction (as by threats)," and a "threat" is "an expression of an intention to inflict evil, injury, or damage on another." Pl. Mem. 26. Taken in their proper context, Defendants' threats and actions have made Schwartz, Lopez, and many individual voters served by MFV fearful because they express an intent to inflict injury or damage to Plaintiffs' right to vote, thus meeting the definitions of "intimidate" and "threaten."[4]

---

[4] The Government does not dispute that, unlike some other civil rights statutes (including its own immediate predecessor, Section 131(b) of the Civil Rights Act of 1957), Section 11(b) does *not* require an intent to intimidate,

As the Department of Justice has elsewhere noted, even criminal voter intimidation is often "amorphous," "largely subjective in nature," and "subtle."[5] Furthermore, "a principle of enormous importance in the enforcement of civil rights" is that "acts otherwise lawful may become unlawful and be enjoined . . . if the purpose and effect of the acts is to interfere with the right to vote." *United States v. Original Knights of Ku Klux Klan*, 250 F. Supp. 330, 348 (E.D. La. 1965). And Trump is not just a private citizen tweeting threats.[6] As Justice Jackson, recently returned from the Nuremberg Trials, noted in 1952, the President is unique because "[n]o other personality in public life can begin to compete with him in access to the public mind through modern methods of communications." *Youngstown Sheet & Tube Co. v. Sawyer*, 343 U.S. 579, 653–54 (1952) (Jackson, J., concurring); *see also Trump v. Hawaii*, 138 S. Ct. 2392, 2417–18 (2018) ("The President of the United States possesses an extraordinary power to speak to his fellow citizens and on their behalf."). Moreover, in him is vested "the executive Power—all of it." *Seila Law LLC v. Consumer Fin. Prot. Bureau*, 140 S. Ct. 2183, 2191 (2020) (quotation marks omitted). It is not unreasonable for voters to believe the President's threats. And if the level of fear created "by posting off-duty sheriffs and policemen— some of whom were wearing equipment normally associated with law enforcement personnel such as two-way radios and firearms—at polling places in minority precincts," *Dem. Nat'l Comm. v. Rep. Nat'l Comm.*, 671 F. Supp. 2d 575, 579 (D.N.J. 2009), violates Section 11(b), so does the President threatening to post *on-duty* law enforcement officials with a far more

---

or any particular intent at all. Instead, the question is whether the conduct has an intimidating effect on its audience. *Compare* Pl. Mem. 34-35 (arguing no intent requirement) *with* Gov. Mem. 27-31 (declining to address this point).
[5] U.S. Dep't of Justice, *Federal Prosecution of Election Offenses* 54 (7th ed. rev. Aug. 2007), *available at* https://www.justice.gov/sites/default/files/criminal/legacy/2013/09/30/electbook-rvs0807.pdf.
[6] The Government describes various 2016 cases as involving "comparable language and conduct," Gov. Mem. 28, but none of them involved a threat from the sitting President of the United States to deploy "law enforcement" at the polls just weeks after deploying that same law enforcement to attack protesters in the streets.

terrifying presentation vividly demonstrated on national television by tactical teams from militarized law enforcement units.

Finally, the Government barely addresses Trump's repeated threats to the integrity of the ballot-counting process. *See* Pl. Mem. 9-13, 32-33. There is, for better or worse, a distinction between a private citizen (even a presidential candidate) ranting that mail-in ballots should not be counted, and the incumbent, re-election-seeking President of the United States doing so. To be sure, no Section 11(b) case has addressed this precise scenario, but that is partly because no previous President has raised the issue before.[7]

While in some ways Defendants' intimidation follows a well-worn path under Section 11(b), threatening baseless investigations and prosecutions, *see, e.g., United States v. McLeod*, 385 F.2d 734 (5th Cir. 1967), in other ways this case does not sit on all fours with previous cases for the simple reason that no sitting President or his officials have even approached this type of misconduct. This Court has elsewhere noted that "James Madison, who cautioned us to beware 'the abridgement of freedom of the people by gradual and silent encroachments by those in power,' would be aghast" at a program of warrantless data collection. *Klayman v. Obama*, 957 F. Supp. 2d 1, 42 (D.D.C. 2013) (citation omitted), *vacated and remanded*, 800 F.3d 559 (D.C. Cir. 2015). But although this type of "gradual and silent" abridgement may be more common than "violent and sudden usurpations," *id.* at 42 n.67 (quotation marks omitted), when the President of the United States and his senior officials so intimidate voters that they threaten the integrity of a free and fair election, the Voting Rights Act provides a remedy.

---

[7] Similarly, in times past, Attorneys General were better known for enforcing the Voting Rights Act against voter intimidation than for engaging in it themselves. *See* Pl. Mem. at 12.

C.       **The Court Has Subject-Matter Jurisdiction Over Plaintiffs' VRA Claims**

1.       **There Is a Private Right of Action Under Section 11(b) of the VRA**

Private enforcement has long been the chief mechanism for redressing violations of the Voting Rights Act. *See Allen v. State Bd. of Elec.*, 393 U.S. 544, 557 (1969) (finding a private right of action under Section 5, and explaining that the VRA, "although not specifically authorizing members of the protected class to institute suit, nevertheless implied a private right of action"). Since *Allen*, the Supreme Court has determined that private rights of action exist under both Section 2, *see Shelby Cnty., Ala. v. Holder*, 570 U.S. 529, 577 (2013), and Section 10, *see Morse v. Rep. Party of Va.*, 517 U.S. 186, 231 (1996) ("achievement of the Act's laudable goal could be severely hampered . . . if each citizen were required to depend solely on litigation instituted at the discretion of the Attorney General") (quotation marks and citations omitted). The Supreme Court has even found that Congress enacted preclearance provisions in recognition that neither private nor public enforcement alone could sufficiently redress ongoing harm. *See Perkins v. Matthews*, 400 U.S. 379, 396 (1971) ("[T]he Department of Justice does not have the resources to police effectively all the States and subdivisions covered by the Act and [] private suits seem unlikely to sufficiently supplement federal supervision."); *see also South Carolina v. United States*, 898 F. Supp. 2d 30, 52 (D.D.C. 2012) ("[T]he Supreme Court long ago recognized a private right of action").

Defendants' sweeping claim that there is no private right of action unpersuasively relies upon recent decisions limiting the expansion of *Bivens v. Six Unknown Named Agents*, 403 U.S. 388 (1971), to newly implied damages remedies for constitutional violations.[8] They do not

---

[8] Defendants' reliance on *Ziglar v. Abbasi* is misplaced, as there the Court only counseled against expansion of "implied causes of action for damages" pursuant to *Bivens*. *See Ziglar v. Abbasi*, 137 S. Ct. 1843, 1856-57 (2017); *see also Johnson v. Interstate Mgmt. Co., LLC*, 849 F.3d 1093, 1097-98 (D.C. Cir. 2017) (citing *Morse* and distinguishing private right of action under VRA from limiting language in another statute).

apply where, as here, legislative history establishes a Congressional intent to create a private right of action to enforce voting rights under the VRA. In determining whether an implied right of action exists, courts employ the four-factor analysis articulated in *Cort v. Ash*, 422 U.S. 66, 78 (1975).[9] But there is no need for the Court "to trudge through all four of the factors when the dispositive question of legislative intent has been resolved." *Merrill Lynch, Pierce, Fenner & Smith, Inc. v. Curran*, 456 U.S. 353, 388 (1982) (citation omitted).

The legislative history of the VRA shows that Congress intended to allow a private right of action under the VRA in general, including Section 11(b). Congress's overall intent in passing the VRA was to expand upon the previous Civil Rights Act of 1957, which included a still-extant intimidation provision (Section 131(b)) now codified at 52 U.S.C. § 10101(b). Section 11(b) was drafted with the intent of updating and expanding that section. *See* H.R. Rep. No. 89-439, at 30 (1965); *Voting Rights, Part 1: Hearings on S. 1564 Before the S. Comm. on the Judiciary*, 89th Cong. 16 (1965) (testimony of Attorney General Nicholas Katzenbach). "[T]he provision giving the Attorney General the right to bring a civil suit" was not added until after the VRA was first passed, after years in which private plaintiffs "could and did enforce the provisions." *Schwier v. Cox*, 340 F.3d 1284, 1295 (11th Cir. 2003).

Since then, courts have explicitly or implicitly recognized a private right of action under Section 11(b), both when plaintiffs have prevailed, *see, e.g., Daschle v. Thune*, No. 4:04 Civ 04177 (D.S.D. Nov. 1, 2004), and when they have lost on the merits, *see, e.g., Olagues v. Russoniello,* 797 F.2d 1511, 1522 (9th Cir. 1986), *vacated as moot*, 484 U.S. 806 (1987); *Ohio*

---

[9] The *Cort* test asks (1) "is the plaintiff one of the class for whose *especial* benefit the statute was enacted," (2) "is there any indication of legislative intent, explicit or implicit, either to create such a remedy or to deny one," (3) "is it consistent with the underlying purposes of the legislative scheme to imply such a remedy," and (4) "is the cause of action one traditionally relegated to state law, in an area basically the concern of the States, so that it would be inappropriate to infer a cause of action based solely on federal law[.]" 422 U.S. at 78 (quotation marks and citations omitted).

*Dem. Party v. Ohio Rep. Party*, No. 16 Civ. 02645, 2016 WL 6542486, at *1 (N.D. Ohio Nov. 4, 2016) (granting temporary restraining order), *stayed pending appeal*, *Ohio Dem. Party v. Donald J. Trump for President, Inc.,* No. 16 Civ. 4268, 2016 WL 6608962 (6th Cir. 2016); *Ariz. Dem. Party v. Ariz. Rep. Party*, No. 16 Civ. 03752, 2016 WL 8669978, at *4 (D. Ariz. Nov. 4, 2016) (denying relief but first holding that Section 11(b) provides a private right of action); *Willingham v. Cnty. of Albany*, 593 F. Supp. 2d 446, 461 (N.D.N.Y. 2006).

### 2.        Sovereign Immunity Does Not Bar this Case

The Government Defendants are not immune from the declaratory and injunctive claims Plaintiffs bring in this case. By Section 702 of the Administrative Procedure Act ("APA"), 5 U.S.C. § 702, the Government has waived its sovereign immunity where, as here, plaintiffs' "claims are for non-monetary relief." *Quaid v. Kerry*, 161 F. Supp. 3d 70, 74 (D.D.C. 2016). Section 702 states:

> An action in a court of the United States seeking relief other than money damages and stating a claim that an agency or an officer or employee thereof acted or failed to act in an official capacity or under color of legal authority shall not be dismissed nor relief therein be denied on the ground that it is against the United States or that the United States is an indispensable party.

5 U.S.C. § 702.

This "constitutes an explicit waiver of the federal government's immunity with respect to suits for nonmonetary damages." *Quaid*, 161 F. Supp. 3d at 73-74 (quotation marks and citation omitted); *see also Cohen v. United States*, 650 F.3d 717, 723 (D.C. Cir. 2011) (finding that under Section 702 "there is no doubt Congress lifted the bar of sovereign immunity in actions not seeking money damages").

Moreover, the Section 702 waiver is not limited to claims brought under the APA. "With respect to claims for non-monetary relief, the 1976 amendments to § 702 of the

Administrative Procedure Act, 5 U.S.C. § 702, eliminated the sovereign immunity defense in virtually all actions for non-monetary relief against a U.S. agency or officer acting in an official capacity." *Clark v. Library of Cong.*, 750 F.2d 89, 102 (D.C. Cir. 1984); *see also Chamber of Com. v. Reich*, 74 F.3d 1322, 1328 (D.C. Cir. 1996) ("The APA's waiver of sovereign immunity applies to any suit whether under the APA or not." (quotation marks and citations omitted)); *Quaid*, 161 F. Supp. 3d at 74 ("[T]he question of whether APA Section 702's waiver applies to a claim turns on the relief being sought and not on the cause of action under which a claim is brought.").

This waiver does not have a special exemption for claims under Section 11(b) of the Voting Rights Act. Section 702 includes a single, inapposite carve-out to its waiver of sovereign immunity for non-monetary claims: "The waiver does not apply 'if any other statute that grants consent to suit expressly or impliedly forbids the relief which is sought' by the plaintiff." *Match-E-Be-Nash-She-Wish Band of Pottawatomi Indians v. Patchak*, 567 U.S. 209, 215 (2012) (quoting 5 U.S.C. § 702).[10] The Government does not identify any other statute that expressly or impliedly forbids the injunctive and declaratory relief Plaintiffs seek. None exists.

Unable to avoid the plain language of Section 702, the Government attempts to conjure an exception to its application that is unsupported by the case law. Relying solely on *United States v. Bormes*, 568 U.S. 6 (2012), the Government argues that Section 702's waiver does not apply where a statute "contains its own self-executing remedial scheme." *Bormes* says no such thing. In *Bormes*, the Supreme Court considered whether the Little Tucker Act authorizes *money damages* claims against the United States under the Fair Credit Reporting Act.

---

[10] The D.C. Circuit recently rejected an additional purported exception, not applicable here, to Section 702's sovereign immunity waiver. *See Perry Cap. LLC v. Mnuchin*, 864 F.3d 591, 620-21 (D.C. Cir. 2017).

*See id.* at 11.[11] That case has no bearing here where Plaintiffs do *not* seek money damages and the Government's waiver of sovereign immunity arises from Section 702 of the APA. As a result, there is no basis to deviate from the well-settled rule that "[t]he APA's waiver of sovereign immunity applies to any suit whether under the APA or not." *Reich*, 74 F.3d at 1328.

Additionally, under the *Larson-Dugan* exception, sovereign immunity cannot be used to bar relief against government officials, including the President, for acts committed outside of their statutory authority. *See Dugan v. Rank*, 372 U.S. 609, 621-23 (1963); *Larson v. Domestic & Foreign Corp.*, 337 U.S. 682, 689-91 (1949). "The '*Larson–Dugan* exception' . . . holds that sovereign immunity does not apply as a bar to suits alleging that an officer's actions were unconstitutional or beyond statutory authority, on the grounds that 'where the officer's powers are limited by statute, his actions beyond those limitations are considered individual and not sovereign actions.'" *Swan v. Clinton*, 100 F.3d 973, 981 (D.C. Cir. 1996) (quoting *Larson*, 337 U.S. at 689) (holding that president's violation of federal statute, if found, would waive sovereign immunity); *see also Clark*, 750 F.2d at 102 ("It is well-established that sovereign immunity does not bar suits for specific relief against government officials where the challenged actions of the officials are alleged to be unconstitutional or beyond statutory authority.").

Plaintiffs' claim that the Government Defendants violated Section 11(b) of the Voting Rights Act falls squarely within the *Larson-Dugan* exception. Section 11(b) prohibits any "person, whether acting under color of law or otherwise" from intimidating, threatening, or coercing any other person for, *inter alia*, voting or attempting to vote. 52 U.S.C. § 10307(b). It covers *any* "person," including any person acting "under of color of law."

---

[11] Indeed, the holding the Government cites reads, in full, "Where, as in FCRA, a statute contains its own self-executing remedial scheme, we look only to that statute to determine whether Congress intended to subject the United States to *damages liability*." *Id.* (emphasis added).

Congress did not insert any limit on the types of persons to which Section 11(b) applies. Nor did it limit Section 11(b)'s application to persons who act under specific legal authority. *Cf.* 42 U.S.C. § 1983 (applying only to persons who act "under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory or the District of Columbia"). Instead, the plain language of Section 11(b) makes it clear that it covers *anyone* who acts under color of *any law*. Where Congress includes specific language in one statute, but deliberately omits it in an otherwise similar statute, the Court may conclude that "Congress knows full well how to provide" the language that it chose to omit. *Am. Ins. Ass'n v. U.S. Dep't of Housing & Urban Dev.*, 74 F. Supp. 3d 30, 42 (D.D.C. 2014), *vacated and remanded*, No. 14-5321 (Sept. 23, 2015). Section 11(b) thus prohibits the Government Defendants from using their powers to "intimidate, threaten, or coerce" citizens who hope to exercise their right to vote. Under *Larson-Dugan*, they are not immunized from suit where, as here, they have violated that prohibition.

### 3. Plaintiffs Have Standing

Plaintiffs have each suffered an injury in fact sufficient to confer standing under Article III.  "To establish [] standing, a plaintiff must show (1) an injury in fact, (2) a sufficient causal connection between the injury and the conduct complained of, and (3) a likelihood that the injury will be redressed by a favorable decision." *Susan B. Anthony List v. Driehaus*, 573 U.S. 149, 157-58 (2014) (quotations, citations and alterations omitted). Here, Plaintiffs have each alleged particularized and concrete injuries sufficient to give them standing.

### a. Plaintiffs Schwartz and Lopez Have Standing

Plaintiffs Schwartz and Lopez have been and are being intimidated by Defendants in connection with voting. Nothing more is needed to give them standing for their claims.

Section 11(b) creates a legal right to vote, attempt to vote, or aid another person to vote free from intimidation and threat or attempted intimidation and threat. *See* 52 U.S.C.

§10307(b). As it did when it enacted Section 11(b), "'Congress may enact statutes creating legal rights, the invasion of which creates standing, even though no injury would exist without the statute.'" *Shays v. Fed. Election Comm'n*, 414 F.3d 76, 89 (D.C. Cir. 2005) (citation omitted). Plaintiffs Schwartz and Lopez have both established that Defendants have violated their Section 11(b) right to vote free from intimidation and threat, and thus that they have been injured.

Schwartz is "afraid to cast [her] vote in-person and by mail in the upcoming election." Schwartz Decl. ¶ 3. Trump's "encouragement to his supporters to independently monitor the polls" in Philadelphia as well as his direct appeal to the Proud Boys, a group that espouses white supremacist and neo-Nazi ideals, has "concerned" and "terrif[ied]" Schwartz, who is a Jewish woman. *Id.* ¶¶ 19-21. She has even seen local vigilantes in her neighborhood "carrying guns, baseball bats, and golf clubs." *Id.* ¶ 14.

Trump's constant attacks on mail-in voting intimidate Schwartz as well. She has seen Trump's and Barr's false claims that mail-in voting is fraudulent, *see id.* ¶¶ 27-28, 31, 32, she has seen Trump falsely claim that he has a right to stop people from voting by mail, *see id.* ¶ 29, she has seen Trump threaten that mail-in ballots will be subjected to judicial challenge, *see id.* ¶¶ 30-31, and she has seen Trump's efforts to defund the United States Postal Service for the purpose of interfering with voting by mail, *see id.* ¶¶ 34-36. Together, these actions have made Schwartz "afraid that [her] mail-in ballot will not be counted" and that Defendants "may even create some baseless legal investigation or action against me for voter fraud." *Id.* ¶ 33.

Similarly, "Defendants' conduct has made [Lopez] nervous about exercising [her] right to vote in the upcoming presidential election." Lopez Decl. ¶ 4. She is afraid to vote in person because her asthma places her at heightened risk if she contracts COVID-19. *Id.* ¶¶ 17-18. But because of Defendants' statements and conduct, she is "nervous" and "concerned" about

voting by mail—her only realistic option. *Id.* ¶ 20. Trump's statements about courts reviewing mail-in ballots have left her "worried that [her] application will be submitted to a court for inspection." *Id.* ¶ 21. Trump's threats that law enforcement will be present at polling places, *see id.* ¶ 26, his encouragement to his supporters to go to polling places, *see id.* ¶¶ 27-29, his tweets promoting violence, *see id.* and his direct appeal to the Proud Boys, *see id.* ¶ 30, have, together, made Lopez nervous about dropping off her mail-in ballot at a drop-off box. As a "petite," 23-year-old Latina woman, she is "scared to walk past people who may or may not be armed and who are watching [her], simply to cast [her] ballot." *Id.* ¶¶ 3, 31. She is also concerned about voting by mail because of Trump's "attacks on the Postal Service," *id.* ¶ 34, and his suggestion that "he might take actions to prevent the counting of all absentee ballots," *id.* ¶ 35.

These declarations establish standing under Section 11(b). "To establish injury in fact, a plaintiff must show that he or she suffered an invasion of a legally protected interest that is concrete and particularized and actual or imminent, not conjectural or hypothetical." *Spokeo, Inc. v. Robins*, 136 S. Ct. 1540, 1548 (2016), *as revised* (May 24, 2016) (quotation marks and citation omitted); *see also Klayman v. Obama*, 957 F. Supp. 2d 1, 26 (D.D.C. 2013). "For an injury to be particularized, it must affect the plaintiff in a personal and individual way." *Spokeo*, 136 S. Ct. at 1548 (quotation marks and citation omitted). A "concrete" injury must be "*de facto*," but it need not be "tangible." *Id.* at 1548-49. "[I]ntangible injuries can nevertheless be concrete." *Id.* at 1549.

Here, Plaintiffs have been injured by Defendants' "invasion" of their statutorily created right to be free from intimidation and threats in connection with voting. *See id.* at 1548; *see also Shays*, 414 F.3d at 89. Both Schwartz and Lopez identify specific statements and conduct of the Defendants that have caused them to be "nervous," concerned," and "terrified"

about voting in the upcoming election.[12] Section 11(b) grants them a legal right to exercise their right to vote free from these very real fears. The mental anguish Defendants are forcing these Plaintiffs to endure affects them each in "a personal and individual way" and constitutes "*de facto*" or "concrete" injury. *Spokeo*, 136 S. Ct. at 1548-49 (quotation marks omitted).[13]

Whether the fears that Defendants have created through intimidation and threats in fact come to fruition is irrelevant. Section 11(b) protects Plaintiffs from the intimidation and threats themselves, and thus they experience injury from the very fear Defendants are instilling in them right now. Nothing in the statute requires Plaintiffs to show that they have actually been prevented from voting or having their ballot counted. To the contrary, the Department of Justice itself has stated that voter intimidation includes a broad range of conduct "intended to force prospective voters to vote against their preferences, or refrain from voting, through activity reasonably calculated to instill some form of fear."[14] Defendants' conduct has had the "inevitable effect" of discouraging, intimidating, and threatening Plaintiffs as they seek to exercise their right to vote. *See United States v. Clark*, 249 F. Supp. 720, 728 (S.D. Ala. 1965). Plaintiffs need not wait to see whether Defendants carry through on their threats to assert their claim.[15]

---

[12] The Government's claim that Plaintiffs' fears are not traceable to Defendants' conduct is without merit. As Plaintiffs state in their Declarations, Defendants' statements themselves are causing Plaintiffs' fear and feelings of intimidation. Many of Defendants' statements invoke their own authority—e.g., the threat to send law enforcement to polling places. But even the statements that encourage third-party action are intimidating in and of themselves. Plaintiffs reasonably fear going to polling places because the President has asked vigilantes to be there. Whether those vigilantes heed his call is immaterial—the President's statements alone have intimidated Plaintiffs.

[13] Trump's claim that Plaintiffs are merely asserting a generalized injury is without merit. Trump cites two inapposite cases in which the plaintiffs' only alleged injury was that the law had "not been followed." *Lance v. Coffman*, 549 U.S. 437, 442 (2007); *Valley Forge Christian Coll. v. Americans United for Separation of Church & State, Inc.*, 454 U.S. 464, 485 (1982) ("Although respondents claim that the Constitution has been violated, they claim nothing else."). Here, in stark contrast, Schwartz and Lopez have established that they have each personally been intimidated by Defendants' threats and that it is having a significant impact on their ability to vote.

[14] Dep't of Justice, *Federal Prosecution of Election Offenses*, May 2007, https://www.justice.gov/sites/default/files/criminal/legacy/2013/09/30/electbook-rvs0807.pdf.

[15] Indeed, in other contexts, the Supreme Court has recognized that the threat of unconstitutional governmental action is sufficient to create standing. *See, e.g.*, *Susan B. Anthony List*, 573 U.S. at 166 ("The burdensome Commission proceedings here are backed by the additional threat of criminal prosecution. We conclude that the combination of those two threats suffices to create an Article III injury under the circumstances of this case."); *MedImmune, Inc. v. Genentech, Inc.*, 549 U.S. 118, 128-29 (2007) ("[W]here threatened action by *government* is

The fact that the statutory violation has already occurred (Defendants have intimidated and threatened Plaintiffs in connection with voting), and continues to occur, distinguishes this case from *Clapper v. Amnesty Int'l*, 568 U.S. 398 (2013), upon which the Government relies. There, the Court found allegations of future surveillance to be speculative where there was no way of knowing whether the Government would target the plaintiffs' communications and, even if it did, whether it would use the challenged statutory procedures to do so. *Id.* at 410-14. In other words, the constitutional violation had yet to occur and there was no way to know whether it would occur in the future. Here, in contrast, there is nothing speculative about Plaintiffs' feelings of intimidation. Plaintiffs have stated under oath that they experience current and ongoing fear as a result of Defendants' statements and conduct, establishing a particular and concrete injury to their legal right to vote free from intimidation.

### b.     Plaintiff Mi Familia Vota Education Fund Has Standing

Defendants' intimidation of voters has also caused substantial injury to Plaintiff Mi Familia Vota Education Fund ("MFV") and its mission to expand voter education.

An organization is injured for standing purposes when "the actions taken by [the defendant] have 'perceptibly impaired' the [organization's] programs," and when they "directly conflict with the organization's mission." *League of Women Voters of United States v. Newby*, 838 F.3d 1, 8 (D.C. Cir. 2016) (citations omitted; alterations in *Newby*). Defendants' intimidation tactics both impair MFV's programs and conflict with MFV's mission.

Regarding impairment, Defendants have prevented MFV from using its time and resources to "educate voters about issues important to their community." Barba Decl. ¶ 27; Barba

---

concerned, we do not require a plaintiff to expose himself to liability before bringing suit to challenge the basis for the threat.") (emphasis in original).

Supp. Decl. ¶¶ 6, 11. It has been able to reach and serve fewer people because of the time it must spend responding to people's concerns about Defendants' intimidating statements. *See* Barba Decl. ¶ 29; Barba Supp. Decl. ¶¶ 7-12. Its phone bankers are speaking to fewer callers and its canvassers are knocking on fewer doors because they have to spend more time than usual responding to questions about Defendants' disinformation campaigns. *See* Barba Decl. ¶¶ 28-29; Barba Supp. Decl. ¶ 8. And its communications staff has been required to reallocate time to "developing educational content to fight the intimidating effect of Defendants' misinformation" and "conduct new research on the effects of Defendants' intimidation." Barba Supp. Decl. ¶ 11. This time investment has curtailed MFV's ability to carry out its mission to reach members of the Latino and immigrant communities, resulting in fewer points of contact than MFV could otherwise achieve. *See* Barba Decl. ¶ 31; *see also Newby*, 838 F.3d at 9 (finding that decrease in voter registration numbers evidenced organization injury for purpose of standing and irreparable harm for voting rights organization); *Fair Emp. Council of Greater Washington, Inc. v. BMC Mktg. Corp.*, 28 F.3d 1268, 1276 (D.C. Cir. 1994) (organization would establish injury for Article III standing if it could show that defendant's actions made organization's task more difficult, "might increase the number of people in need of counseling," and "may have reduced the effectiveness of any given level of outreach efforts"). Further, MFV has diverted approximately ten percent of its approximately $6 million dollar annual budget to combat Defendant' misinformation campaign, Barba Supp. Decl. ¶ 13, substantially impairing MFV's ability to fully fund its core mission to educate voters and promote civic engagement.

Regarding conflict, Defendants' intimidation tactics conflict with MFV's mission to help more people vote and to educate voters on issues that are relevant to them. *See Newby*, 838 F.3d at 9 (threats and intimidation of voters constitute "obstacles [that] unquestionably make

it more difficult for the [plaintiff] to accomplish their primary mission of registering voters"). Defendants' conduct has predictably dissuaded people from voting. MFV has been trying to counteract the effect of Defendants' actions by preparing resources, Barba Decl. ¶ 30, and training staff to "monitor, inoculate, and clarify the misinformation Trump promotes," *id.* ¶ 36; Barba Supp. Decl. ¶ 9 (MFV had to devote one full-time staff to coordinate efforts to counter Defendants' misinformation in media). Still, Defendants' efforts to intimidate and dissuade voters from voting directly conflicts with MFV's mission to get out the vote.

MFV's diversion of both time and resources from its core organization mission was not a self-inflicted "choice," Gov. Mem. 21, but rather a necessary reaction to Defendants' conduct. MFV was confronted with the reality of Defendants' direct impact on its organizational mission when it repeatedly encountered voters who expressed fear and concern about voting due to President Trump's statements. *See, e.g.*, Barba Decl. ¶ 13 (voters are fearful of going to the polls because of statements by Defendants); *id.* ¶ 22 (describing the fears voters have disclosed to MFV); *id.* ¶ 25 (voter in Texas expressed voting fears to MFV staff). As MFV continued with its efforts to fulfill its mission of getting more people to vote and helping people to better understand the issues that affect their communities, it was unable to avoid the substantially negative effect of Defendants' intimidating acts. Barba Supp. Decl. ¶ 8 (MFV outreach staff "have been forced to spend time answering voters' questions about Trump's repeated threats . . ."); Barba Decl. ¶ 33 ("Our team has had to spend significant time educating voters . . . because we have spoken to so many voters who do not trust the vote-by-mail system because of Trump's repeated attacks."); *id.* ¶ 34 ("[T]he team has to assure people about their right to vote by mail."). *See Equal Rights Ctr. v. Post Props., Inc.*, 657 F. Supp. 2d 197, 200 (D.D.C. 2009), *aff'd*, 633 F.3d 1136 (D.C. Cir. 2011); *see also Spann v. Colonial Vill., Inc.*, 899 F.2d 24, 28–29

(D.C. Cir. 1990) (finding that an organization's necessary increase in education costs due to another party's actions constitutes organizational injury).

Faced with potential voters who are at risk of not voting, MFV, an organization created for the purpose of promoting civic engagement and educating voters on the issues, had no choice but to divert its time and resources away from its core organizational mission to combat Defendants' intimidation tactics and simply make sure voters felt safe exercising their right to vote. Those injuries are more than sufficient to confer Article III standing.

## II.     PLAINTIFFS FACE IRREPARABLE HARM

Absent immediate relief, Defendants ongoing threats and intimidation will cause irreparable harm. "It has long been established that the loss of constitutional freedoms, 'for even minimal periods of time, unquestionably constitutes irreparable injury.'" *Mills v. District of Columbia*, 571 F.3d 1304, 1312 (D.C. Cir. 2009) (citation omitted). "And that harm is irreparable because after the registration deadlines for the November election pass, 'there can be no do over and no redress.'" *Newby*, 838 F.3d at 9 (citation omitted); *see also R.J. Reynolds Tobacco Co. v. U.S. Food & Drug Admin.,* 823 F. Supp. 2d 36, 50 (D.D.C. 2011) (noting that "the harm flowing from a First Amendment violation is *per se* irreparable").

Plaintiffs have identified sufficient injury to establish irreparable harm. Schwartz and Lopez have "balked at the idea of" voting by particular means, *cf. Newby*, 838 F.3d at 8, and are fearful and harmed as a result of Defendants' call for armed vigilantes and law enforcement to confront individuals at the polls, and their threats to otherwise obstruct ballot delivery and counting. And Defendants' conduct has impaired MFV's ability to reach as many voters as possible and made it more difficult for MFV "to accomplish [its] primary mission of registering voters," *Id.* at 9, and encouraging citizens to vote in the November election. These harms establish sufficient "injury for purposes both of standing and irreparable harm." *Id.*

20

III.    **THE BALANCE OF THE EQUITIES AND THE PUBLIC INTEREST WEIGH IN FAVOR OF PLAINTIFFS' REQUESTED RELIEF**

The balancing of equities and the public interest also heavily weigh in Plaintiffs' favor. First, "the public interest further favors a preliminary injunction because, absent an injunction, there is a substantial risk that citizens will be disenfranchised in the present federal election cycle." *Id.* at 12. "The public has a 'strong interest in exercising the fundamental political right to vote.'" *Id.* (quoting *Purcell v. Gonzalez*, 549 U.S. 1, 4 (2006)). "In that respect, the programmatic harm to [Plaintiffs] dovetails with the public interest." *Id.* at 13.

Second, the Government Defendants have no recognizable interest in violating the VRA's prohibition on voter intimidation. Pursuit of their lawful duties and activities does not *require* them to intimidate or threaten voters. Even if a conflict were to arise, Section 11(b)'s ban on intimidation under color of law admits no exceptions, and courts are prohibited "from second-guessing Congress's lawful prioritization of its policy goals." *Gordon v. Holder*, 721 F.3d 638, 652–53 (D.C. Cir. 2013). That is particularly so with respect to the provisions of the requested relief that involve deployment of armed units at or near polling places. *See Burson v. Freeman*, 504 U.S. 191 (1992) (upholding limits on political speech near polling places).

Nor does Trump in his individual capacity have any legitimate interest in threatening and intimidating voters. His interest in advancing (baseless) fraud claims is far outweighed by the interest in protecting voters from intimidation and threats—which are generally not protected by the First Amendment, certainly in civil cases. *See generally Elonis v. United States*, 575 U.S. 723 (2015). Indeed, Section 11(b) intimidation cases are often partly predicated on verbal threats or intimidation. *See, e.g., Paynes v. Lee*, 377 F.2d 61, 63 (5th Cir. 1967) (reversing district court's dismissal of Section 11(b) case where allegations included an oral threat). The requested relief permits Trump to express his views on political topics, but is

21

tailored to prohibit intimidation and threats.[16]

Finally, the action is well-timed. Although some of the background that helps establish context took place over the summer, key precipitating events—such as Defendant Trump's instruction to white supremacists to "stand by," and instances early of misconduct at or near polling places—took place in the past few weeks, especially as early voting began. *See* Pl. Mem. 6-9. And now is when the relief would be most meaningful—and narrowest, since it would restrain Defendants for the shortest period of time.

## IV. PLAINTIFFS ARE ENTITLED TO EQUITABLE RELIEF AGAINST THE PRESIDENT

The Court has the power to issue equitable relief against the President. In fact, the Supreme Court and courts throughout the country have repeatedly issued equitable relief against the President. *See* Pl. Mem. 44-45. The Government does not even attempt to distinguish these cases. Most notably, the Government fails to explain how courts could order the President to release confidential White House tapes, *see United States v. Nixon*, 418 U.S. 683 (1974), if, as the Government claims, courts are powerless to issue equitable relief against the President.

Instead, the Government advances a maximalist position, arguing for a sweeping form of presidential immunity from all equitable relief that is not supported by the cases on which they rely. *Mississippi v. Johnson*, 71 U.S. (4 Wall.) 475 (1867), was a Reconstruction-era case in which the State of Mississippi sought an injunction restraining the President and an Army general from *carrying out* federal statutes. *See id.* at 497. Courts have long understood *Johnson* as representing an early application of the political question doctrine, not as a presidential immunity case. *See Ohio v. Wyandotte Chems. Corp.*, 401 U.S. 493, 496 (1971) (citing *Johnson*

---

[16] The Government Defendants have even less protectable interest. The Government cannot assert First Amendment rights in its defense; the First Amendment protects individuals from the Government, not the other way around.

among cases that sought "to embroil [the Court] in 'political questions'"); *Baker v. Carr*, 369 U.S. 186, 224-26 & n.52 (1962) (reviewing *Johnson* among "precedents as to what constitutes a nonjusticiable 'political question'"). Its reasoning has thus been extended to executive officers generally, instead of being limited to suits against the President. *See, e.g., Louisiana v. McAdoo*, 234 U.S. 627, 633-34 (1914) (in case against cabinet officer, citing *Johnson* among cases where courts had "refuse[d] to substitute their judgment or discretion for that of the official entrusted by law with its execution"). Indeed, in *Johnson* itself, the Court's holding applied to both the President and a general, without distinguishing between the two. Not even the Government contends that the Court cannot enjoin a subordinate federal official.

Nor does *Franklin v. Massachusetts*, 505 U.S. 788 (1992), carry the weight the Government ascribes to it. In *Franklin*, a *plurality* of the Supreme Court, in *dicta*, quoted *Johnson* for the "general" proposition that courts do not have jurisdiction to enjoin the President. *See id.* at 802-03. Despite this *dicta*, the plurality ultimately concluded that it "need not decide whether injunctive relief against the President was appropriate." *Id.* at 803. The Government relies heavily on Justice Scalia's concurrence in *Franklin*, but he wrote only for himself.[17]

Notwithstanding *Johnson*, *Franklin*, and their progeny, the long line of Supreme Court cases in which the Court *has granted equitable relief against the President* controls here. *See* Pl. Mem. at 44-45 (collecting cases). The "separation-of-powers doctrine does not bar every exercise of jurisdiction over the President of the United States." *Nixon v. Fitzgerald*, 457 U.S. 731, 753-54 (1982). To the contrary, the Supreme Court has "long held that when the President

---

[17] The lower court cases the Government cites merely parrot the sweeping statements in *Johnson* that are quoted in *dicta* in *Franklin*. *See Swan v. Clinton*, 100 F.3d 973, 977 (D.C. Cir. 1996); *Newdow v. Roberts*, 603 F.3d 1002, 1012 (D.C. Cir. 2010); *Newdow v. Bush*, 355 F. Supp. 2d 265 (D.D.C. 2005). None of them discuss the context in which *Johnson* was decided, acknowledge that *Johnson* applied to federal officials beyond the President, or address the Supreme Court's repeated statement that *Johnson* is a political question case, not an immunity case.

takes official action, the Court has the authority to determine whether he has acted within the law." *Clinton v. Jones*, 520 U.S. 681, 703 (1997). That authority would be meaningless if the Court could not enjoin the President's unlawful conduct. Under these circumstances, where equitable relief is needed to stop the President from intimidating and threatening voters in violation of the Voting Rights Act, nothing warrants immunizing the President.[18]

## V.      PLAINTIFFS ARE ENTITLED TO EXPEDITED DECLARATORY RELIEF

Plaintiffs are entitled to an expedited declaratory judgment pursuant to Federal Rule of Civil Procedure 57, notwithstanding the early stage of the proceedings. This is important precisely because of Defendants' argument that the President cannot be enjoined. In *Knight First Amendment Inst. at Columbia Univ. v. Trump*, 302 F. Supp. 3d 541 (S.D.N.Y. 2018), *aff'd*, 928 F.3d 226 (2d Cir. 2019), the plaintiffs sought injunctive relief against the President and one of his assistants. The district court expressed uncertainty about enjoining the President and "decline[d] to do so at this time because declaratory relief is likely to achieve the same purpose. The Supreme Court has directed that we should 'assume it is substantially likely that the President and other executive . . . officials would abide by an authoritative interpretation of [a] . . . constitutional provision,'" *Id.* at 579 (quoting *Franklin*, 505 U.S. at 803 (plurality opinion); *see Utah v. Evans*, 536 U.S. 452, 464 (2002) (following *Franklin* in holding that declaratory judgment is likely to provide relief because officials probably would follow ruling on statutory or constitutional provision); *Castañon v. United States*, 444 F. Supp. 3d 118, 134-35 (D.D.C. 2020) (distinguishing *Franklin* because it is uncertain that Congress would adopt the law that plaintiffs desired even if declaratory judgment issued).

---

[18] Trump's claim that he is absolutely immune from suit in his individual capacity is foreclosed by clear Supreme Court precedent. *See Clinton*, 520 U.S. at 681; *see also Trump v. Vance*, 140 S. Ct. 2412, 2426 (2020).

Plaintiffs' request for declaratory judgment is not premature, even though the Government has not yet filed a responsive pleading. The two district court decisions upon which the Government relies, *Perry v. Correct Care Solutions, LLC*, No. 17 Civ. 586, 2017 WL 11519168, *3 (E.D. Va. Jun. 2, 2017) and *Gardner v. Newsom*, No. 20-cv-00240, 2020 WL 4808696, *1 (E.D. Cal. Jul. 10, 2020), are distinguishable in two ways. First, neither case raised claims against the President that caused a court to refrain from granting injunctive relief on prudential grounds and made a declaratory judgment an alternative form of relief. Second, neither case would become moot if a declaratory judgment hearing had to await the defendant's filing of a responsive pleading, whereas in this case the election will be long over if the Government takes its allotted 60 days to file an answer. Under these highly unusual circumstances, the Court may proceed without waiting for a responsive pleading.

The Government also disputes the propriety of a declaratory judgment because the claims involved mixed fact and law, not just pure legal analysis. But that was also true in *Franklin* and *Evans*, which involved complex counting issues raised by decennial censuses: in *Franklin* the method used for allocating military employees to a state and in *Evans* "hot-deck imputation" by which the Census Bureau filled in gaps in its information and resolved conflicts in the data. The factual issues underlying the legal conclusions did not prevent issuance of declaratory judgments in those cases and should not do so here.

## CONCLUSION

For the foregoing reasons, and for the reasons set forth in Plaintiffs' moving papers, Plaintiffs request that this Court grant their motion, issue a temporary restraining order, preliminary injunction, and declaratory judgment, as set forth in the Proposed Order.

Date:   October 28, 2020
        Washington, D.C.

Respectfully submitted,

MEHRI & SKALLET, PLLC

By: ___/s/ Michael Lieder_____
Cyrus Mehri
Michael Lieder
1250 Connecticut Ave., NW, Suite 300
Washington, DC 20036
cmehri@findjustice.com
mlieder@findjustice.com

EMERY CELLI BRINCKERHOFF ABADY
WARD & MAAZEL LLP

Matthew D. Brinckerhoff (*pro hac vice* pending)
Jonathan S. Abady (*pro hac vice* pending)
Samuel Shapiro (*pro hac vice* pending)
Marissa R. Benavides (*pro hac vice* pending)
600 Fifth Avenue, 10th Floor
New York, NY 10020
Tel: 212-763-5000
mbrinckerhoff@ecbawm.com
jabady@ecbawm.com
sshapiro@ecbawm.com
mbenavides@ecbawm.com

FREE SPEECH FOR PEOPLE

Ronald Fein (D.D.C. Bar No. MA0012)
rfein@freespeechforpeople.org
Gillian Cassell-Stiga (*pro hac vice* pending)
gillian@freespeechforpeople.org
John Bonifaz (*pro hac vice* pending)
jbonifaz@freespeechforpeople.org
Ben Clements (*pro hac vice* pending)
bclements@freespeechforpeople.org
1320 Centre Street, Suite 405
Newton, MA 02459
Telephone: (617) 244-0234

*Counsel for Plaintiffs*

26